Commonwealth of Pennsylvania, acting :
by the Commonwealth of Pennsylvania :
Department of Environmental :
Protection and the Commonwealth of :
Pennsylvania Department of :
Conservation and Natural Resources, :
and the Pennsylvania Fish and Boat :
Commission, and the Pennsylvania :
Game Commission, :
              Plaintiffs :
               :
         v. :
             :
Monsanto Co., Solutia Inc., and :
Pharmacia LLC, :   No. 668 M.D. 2020
         Defendants :   Argued: October 20, 2021


BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE J. ANDREW CROMPTON, Judge

OPINION BY
JUDGE COVEY                      FILED:  December 30, 2021


Before this Court are Monsanto Co.'s (Monsanto), Solutia Inc.'s (Solutia), and Pharmacia LLC's (Pharmacia) (collectively, Defendants) Preliminary Objections (POs) to the First Amended Complaint (Complaint) filed by the Commonwealth of Pennsylvania (Commonwealth), acting by and through the Commonwealth's Department of Environmental Protection (DEP), Department of Conservation and Natural Resources (DCNR), Fish and Boat Commission (FBC), and Game Commission (GC) (collectively, Plaintiffs), filed in this Court's original

jurisdiction. After review, this Court sustains the POs in part and overrules them in part.

## Background[1]

Solutia and Pharmacia have succeeded to the liabilities of predecessor Monsanto[2] which, from 1929 to 1977, manufactured, marketed, sold, and distributed approximately 99% of the polychlorinated biphenyls (PCBs) used in the United States (U.S.) - often under the trade names Aroclor, Pydraul, and Turbinol.[3] *See*

---

[1] Because this matter is before this Court on POs, the facts recited are as represented in Plaintiffs' Complaint.

[2] Solutia is a wholly-owned subsidiary of Eastman Chemical Company. *See* Complaint ¶ 30. Pharmacia is a wholly-owned subsidiary of Pfizer, Inc., and is the successor to the original Monsanto Chemical Company (Old Monsanto). *See* Complaint ¶ 31. Hence, Defendants collectively refer to themselves in this litigation as Pharmacia.

"Following a merger transaction that closed in 2018, Monsanto is a wholly-owned subsidiary of Bayer AG." Complaint ¶ 29. "Old Monsanto operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business." Complaint ¶ 32. Now, Monsanto operates Old Monsanto's agricultural products business, Solutia operates Old Monsanto's chemical products business, and Pharmacia operates Old Monsanto's pharmaceuticals business. *See* Complaint ¶¶ 33-41. "Although Solutia assumed and agreed to indemnify [Monsanto] for certain liabilities related to the chemical[] business, Defendants have also entered into agreements to share or apportion liabilities, and/or to indemnify one or more entities, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of [polychlorinated biphenyls]." Complaint ¶ 38. In conjunction with Solutia's Chapter 11 Bankruptcy, "Solutia, Pharmacia, and [] Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemical[] business." Complaint ¶ 39. In Monsanto's last filing with the United States Securities and Exchange Commission before Bayer AG acquired it, Monsanto reported: "Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve [($277 million as of August 31, 2017,)] for the estimated liabilities." Complaint ¶ 41.

[3] "Monsanto sold its PCB products for a variety of uses, including household uses. PCBs were sold for use in paints, caulks, inks, dyes, lubricants, sealants, plasticizers, coolants, hydraulic fluids, fireproofing, and industrial electrical equipment such as capacitors and transformers, among other applications. Monsanto also manufactured and sold various products incorporating their PCB formulations." Complaint ¶ 9; *see also* Complaint Exs. 14-15.

Notably, Old Monsanto also manufactured Dichlorodiphenyltrichloroethane (DDT) (another now infamous chlorinated hydrocarbon similar to PCBs) and, as early as the 1940s, had

Complaint ¶¶ 1, 3-4, 47, Complaint Exs. 14-15. "PCBs are either oily liquids or solids, and are colorless to light yellow[, and t]hey have no known smell or taste." Complaint ¶ 44. PCBs "are toxic and dangerous synthetic[4] organic chemical compounds" harmful to human and animal health, and the environment. Complaint ¶¶ 1, 3; *see also* Complaint ¶ 42, Complaint Exs. 1-13, 16-19. "PCBs do not burn easily, are hydrophobic (i.e., they do not dissolve in water but rather cluster together), and bio-accumulate and bio-magnify in living tissue." Complaint ¶ 48.

Monsanto "acknowledged as early as 1937 that PCBs produce systemic toxic effects upon prolonged exposure." Complaint ¶ 3; *see also* Complaint Exs. 1-13, 16-19. In the 1950s, Monsanto's medical director declared: "[W]e know Aroclors are toxic[,]" and advised workers not to eat lunch in Monsanto's PCB department. Complaint Ex. 4; *see also* Complaint ¶ 3, Complaint Ex. 5. Due to PCBs' proven toxicity and environmental persistence, "production and, with limited exceptions, use of PCBs was prohibited in the [U.S.] in 1979, when the U.S. Environmental Protection Agency ([]EPA[]) promulgated final regulations banning PCBs under the Toxic Substances Control Act [of 1976] ([]TSCA[]), enacted by the U.S. Congress in 1976."[5] Complaint ¶ 2.

Despite that Monsanto knew early on of dangers associated with PCBs, and/or knew or should have known that PCBs "substantially persist in the natural environment rather than break down over time[,]" Complaint ¶ 7; that they "would

---

researched and was aware that DDT was extremely toxic to human and environmental health. *See* Complaint ¶¶ 102-108, 121.

[4] There are no known natural sources of PCBs. *See* Complaint ¶¶ 1, 43.

[5] 15 U.S.C. § 2601-2697. Section 2605(e)(3)(A)(i) of the TSCA declares: "[N]o person may manufacture any [PCB] after two years after January 1, 1977[.]" 15 U.S.C. § 2605(e)(3)(A)(i); *see also Dep't of Gen. Servs. v. U.S. Min. Prods. Co.*, 927 A.2d 717, 721 n.2 (Pa. Cmwlth. 2007), *aff'd*, 956 A.2d 967 (Pa. 2008) ("The [TSCA] banned PCB manufacturing in the United States.").

inevitably volatilize and leach, leak, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events and entering groundwater, waterways, waterbodies, and other waters, sediment, soils, and plants, as well as fish and other wildlife[,]" Complaint ¶ 6; and "that PCBs bio-accumulate and bio-magnify in animal tissue, including in fish tissue and human tissue[, and] . . . pose[] an increasingly hazardous threat to the health of the Commonwealth's residents[,]" Complaint ¶ 8; *see also* Complaint ¶ 48, Monsanto nevertheless continued to market and sell its products containing PCBs. *See* Complaint ¶¶ 9-10, 91-115. In September 1969, Monsanto formed an Aroclor Ad Hoc Committee, the minutes of which reflect: "[W]hile 'there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination . . . [t]here are . . . a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.'" Complaint ¶ 117 (quoting Complaint Ex. 10); *see also* Complaint ¶¶ 112-130. Monsanto also issued talking points for employees to address customer questions and concerns about PCBs in light of the research, and to encourage the customers to use rather than return their existing Aroclor stock because Monsanto did not want to take it back. *See* Complaint ¶ 130, Complaint Ex. 16.

According to the Complaint, "[t]he ordinary and intended application of Monsanto's commercial and household PCB products . . . has resulted in the release of PCBs into the Commonwealth's air, waters, and soils, due principally to the chemical compound's well-known tendency to volatilize or redistribute itself across different environmental media." Complaint ¶ 84. PCBs entered the air, waters, sediments, and soils during their ordinary and prescribed uses. *See* Complaint ¶¶ 49, 84-88. Specifically, PCBs gradually escaped and dispersed from their intended applications (e.g., in road paint or caulking, into the natural

4

environment due to the chemical compounds' inherent tendency to volatilize (i.e., emit vapors), particularly when exposed to heat - such as when road paint or building materials are exposed to the sun over time). *See* Complaint ¶¶ 49, 84. PCB vapors traveled through the air, eventually settling in nearby soil, sediment, or waterbodies; they were released by the grinding, scraping, and removal of caulking and other construction materials that include PCBs. *See* Complaint ¶¶ 49-50, 84-88. PCBs also entered the environment from spills or leaks during chemical transport or fires in transformers, capacitors, or other products containing PCBs, and from waste burning in municipal or industrial incinerators. *See* Complaint ¶¶ 51, 86, 88. PCB-contaminated wastes were disposed of in the ordinary course in landfills, from where they easily escaped, leached, and leaked into the surrounding environment. *See* Complaint ¶¶ 52, 88.

Plaintiffs allege in the Complaint that, once in the environment, PCBs do not break down readily and may remain for decades absent remediation. *See* Complaint ¶ 53. In water, PCBs travel along currents and attach to bottom sediment or particles and evaporate into air or settle into sediment, water, and groundwater. *See* Complaint ¶ 54. In soil, PCBs combine with soil organic matter and remain for many years, and negatively affect plants and microorganisms; they also harm the whole soil biosphere, which leads to human exposure through incidental ingestion, inhalation, or dermal contact. *See* Complaint ¶ 55. As a gas, PCBs can accumulate in the leaves and above-ground parts of plants and food crops. *See* Complaint ¶ 56. PCBs are absorbed by small organisms, fish, marine animals in water, by animals that eat them, and eventually by humans. *See* Complaint ¶ 57. "Human health effects associated with PCB exposure include, without limitation, liver, thyroid, dermal, and ocular changes, immunological alterations, neuro-developmental and neurobehavioral changes, reduced birth weight, reproductive toxicity, and [(liver, biliary tract, intestinal, and skin (melanoma))] cancer." Complaint ¶ 61; *see also*

5

Complaint ¶¶ 62-74. PCBs are also highly toxic to fish and wildlife. *See* Complaint ¶¶ 75-83.

In the Complaint, Plaintiffs assert that Defendants knew PCBs were dangerous contaminants when they manufactured, marketed, sold, and distributed their PCB products, but failed to warn and actively deceived regulators and the public concerning their hazards. *See* Complaint ¶¶ 90-146. Plaintiffs allege that the ordinary and intended use of Defendants' PCB mixtures has resulted in widespread PCB contamination in the Commonwealth. *See* Complaint ¶¶ 84-89. "Between 1929 and 1977, Defendants sold a large volume of commercial PCBs and PCB-containing products to various customers, including retail and secondary manufacturers, within and near the Commonwealth." Complaint ¶ 148. "Monsanto's PCB mixtures and PCB-containing products were used in countless applications within the Commonwealth and leached, leaked, off-gassed, and escaped their ordinary and intended applications to contaminate the Commonwealth's waters, sediments, soils, air, and fish and wildlife." Complaint ¶ 151. "Because Monsanto's PCBs are environmentally persistent, they continue to circulate in the Commonwealth's natural resources to this day." *Id*. "The Commonwealth has already taken significant (and costly) steps to address PCB contamination of surface water bodies and other natural resources, but widespread contamination continues to extensively damage the Commonwealth's natural resources and poses current and future threats to human health and the well-being of the Commonwealth's environment and economy." Complaint ¶ 152. "Like other states, [the Commonwealth] prepares water quality monitoring and assessment reports every other year to satisfy its listing and reporting obligations under [Sections 303(d) and 305(b) of] the Clean Water Act [(CWA).]"[6] Complaint ¶ 153. "The 2020 Draft

_____

[6] 33 U.S.C. §§ 1313(d), 1315(b).

Pennsylvania Integrated Water Quality Monitoring and Assessment Report ("2020 Integrated Report") identifies more than 1,300 miles of [Commonwealth] streams and more than 3,600 of [Commonwealth] lake acres as PCB-impaired - that is, impaired for one or more beneficial uses due to excessive PCB contamination." *Id.* "Like [Commonwealth] waters, [Commonwealth] soils, sediments, and air also suffer PCB contamination." Complaint ¶ 158.

In the Complaint, Plaintiffs specifically argue:

11. Monsanto's PCBs now widely contaminate the Commonwealth's natural resources. Addressing this contamination has (and will continue to) cost the Commonwealth many millions of dollars - costs that ought to be borne by Monsanto, not the Commonwealth and its residents.

12. More than 1,300 miles of streams and more than 3,600 lake acres in the Commonwealth have been identified as "impaired" - that is they do not satisfy the criteria for one or more beneficial uses - because the PCBs in those waterbodies exceed the Commonwealth's water quality standards. Pursuant to the [CWA][7] and [T]he [] Clean Streams Law [(CSL)],[8] the Commonwealth's water quality standards protect "[f]ishing" as a protected, statewide water use. The [f]ishing water use is defined as the use of the water for the legal taking of fish for recreation or consumption. [Sections 93.3 and 93.4 of DEP's Regulations,] 25 Pa. Code §§ 93.3 and 93.4. The water quality standards for [f]ishing, promulgated under the [CSL], have been approved by the [EPA] in accordance with [Section 303 of the CWA] for protection of the nation's waters.

13. Relatedly, the Commonwealth has been forced to issue stringent PCB-specific fish and waterfowl consumption advisories, recommending that the public either not eat certain fish and waterfowl species at all or limit fish consumption to, for example, just 1 meal per month or 6 meals per year for fish taken from nearly 40 segments of

[7] 33 U.S.C. §§ 1251-1388.
[8] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001.

various [Commonwealth] rivers and creeks, to the detriment of [the Commonwealth's] subsistence and sport fishers and the Commonwealth itself.

14. Plaintiffs have incurred and will continue to incur significant costs seeking to combat the PCB contamination attributable to Defendants. Indeed, [the Commonwealth] spent significant funds, time, and effort developing or contributing to the development and implementation of at least [13] Total Maximum Daily Load ([]TMDL[]) plans targeting PCB reduction in local waterbodies.

15. Plaintiffs also have incurred and continue to incur costs to monitor and enforce compliance with PCB limits and conditions contained in individual [CWA] and [CSL] permits. These limits and conditions were specifically included in discharge permits as a means of ensuring not only that the Commonwealth's water quality standards for PCBs are met and maintained, but also to prevent pollution and assist the Commonwealth in achieving the TMDL for PCBs in Commonwealth waters.

16. Plaintiffs also spent considerable time, effort, and money in PCB remediation and removal projects, and restoration of damaged natural resources.

17. The Commonwealth's residents and natural resources, including its water bodies and water systems, have been and continue to be impacted by PCBs manufactured, marketed, distributed, and introduced into commerce by Defendants, and Plaintiffs will be forced to incur significant costs to combat this contamination, costs which rightfully should be borne by Defendants.

Complaint ¶¶ 11-17; *see also* Complaint ¶¶ 147-258.

On March 1, 2021, Plaintiffs filed the Complaint against Defendants in this Court's original jurisdiction alleging causes of action for public nuisance (*see* Complaint ¶¶ 259-276), trespass (*see* Complaint ¶¶ 320-324), design defect (*see* Complaint ¶¶ 277-292), failure to warn and instruct (*see* Complaint ¶¶ 293-306), negligence (*see* Complaint ¶¶ 307-319), and unjust enrichment (*see* Complaint ¶¶ 325-327).

8

On April 1, 2021, Defendants filed the POs and supporting brief, claiming that Plaintiffs lack standing to bring this action (PO 1, ¶¶ 16-32),[9] and that Plaintiffs' causes of action for public nuisance (PO 2, ¶¶ 33-40), trespass (PO 3, ¶¶ 41-45), design defect (PO 4, ¶¶ 46-54), failure to warn and instruct (PO 5, ¶¶ 55-56), negligence (PO 6, ¶¶ 57-62), unjust enrichment (PO 7, ¶¶ 63-64), continuing tort/harm (PO 8, ¶¶ 65-69), and damages (PO 9, ¶¶ 70-74) are legally insufficient.[10]

On May 21, 2021, Plaintiffs filed their answer opposing Defendants' POs. On June 15, 2021, Defendants filed their reply brief in support of the POs. On September 20, 2021, Plaintiffs filed their opposing brief.

### Discussion

> In ruling on preliminary objections, we must accept as true all well-pleaded material allegations in the [complaint], as well as all inferences reasonably deduced therefrom. The Court need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. In order to sustain preliminary objections, *it must appear with certainty that the law will not permit recovery*, and any doubt should be resolved by a refusal to sustain them.
>
> A preliminary objection in the nature of a demurrer admits every well-pleaded fact in the complaint and all inferences reasonably deducible therefrom. It tests the legal sufficiency of the challenged pleadings and will be sustained only in cases where the pleader has clearly failed to state a claim for which relief can be granted. *When ruling on a demurrer, a court must confine its analysis to the complaint*.

---

[9] Pennsylvania Rule of Civil Procedure (Rule) 1028(a)(5) authorizes Defendants to object to the Complaint on the basis that Plaintiffs lack standing. *See* Pa.R.Civ.P. 1028(a)(5).

[10] Rule 1028(a)(4) authorizes Defendants to object to the Complaint on the basis that Plaintiffs' public nuisance, trespass, design defect, failure to warn and instruct, negligence, unjust enrichment, continuing tort/harm, and damage claims are legally insufficient. *See* Pa.R.Civ.P. 1028(a)(4).

*Torres v. Beard*, 997 A.2d 1242, 1245 (Pa. Cmwlth. 2010) (emphasis added; citations omitted). "'[C]ourts reviewing preliminary objections may not only consider the facts pled in the complaint, but also any documents or exhibits attached to it.' *Allen v. Dep't of Corr.*, 103 A.3d 365, 369 (Pa. Cmwlth. 2014)." *Foxe v. Pa. Dep't of Corr.*, 214 A.3d 308, 311 n.1 (Pa. Cmwlth. 2019).

## PO 1 (Lack of Standing)

Defendants argue that, with the limited exception of the Commonwealth's assertion of *parens patriae* for abatement of a public nuisance, which does not confer substantive rights, neither the Commonwealth nor its agencies have authority to bring this action under the other common law theories or for tort damages as a function of its sovereign interest to protect the Commonwealth's citizens. Thus, they request that this Court dismiss all but Plaintiffs' public nuisance cause of action. Defendants also contend that Plaintiffs cannot invoke *parens patriae* standing, yet seek damages to Commonwealth property in its proprietary capacity.

Generally,

> [i]n Pennsylvania, a party to litigation must establish as a threshold matter that he or she has standing to bring an action. *Stilp v. Commonwealth*, . . . 940 A.2d 1227 . . . ([Pa.] 2007). Standing in Pennsylvania is a jurisprudential matter. *City of Phila*[.] *v. Commonwealth*, . . . 838 A.2d 566 . . . ([Pa.] 2003). In our Court's landmark decision on standing, [*Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975) (plurality),] we explained that a person who is not adversely impacted by the matter he or she is litigating does not enjoy standing to initiate the court's dispute resolution machinery.

*Markham v. Wolf*, 136 A.3d 134, 140 (Pa. 2016) (footnote omitted).

> The concept of '**standing**' in its accurate legal sense, is concerned only with the question of *who* **is entitled to make a legal challenge** to the matter involved. . . .

10

> Although our law of standing is generally articulated in terms of whether a would-be litigant has a 'substantial interest' in the controverted matter, and whether he has been 'aggrieved' or 'adversely affected' by the action in question, we must remain mindful that the purpose of the 'standing' requirement is to insure that a legal challenge is by a proper party. . . . The terms 'substantial interest', 'aggrieved' and 'adversely affected' are the general, usual guides in that regard, but they are not the only ones. For example, **when the legislature statutorily invests an agency with certain functions, duties and responsibilities, the agency has a legislatively conferred interest in such matters. From this it must follow that, unless the legislature has provided otherwise, such an agency has an implicit power to be a litigant in matters touching upon its concerns. In such circumstances the legislature has implicitly ordained that such an agency is a proper party litigant,** *i.e.*, **that it has** 'standing.'

*Corman v. Nat'l Collegiate Athletic Ass'n*, 74 A.3d 1149, 1160-61 (Pa. Cmwlth. 2013) (quoting *Pa. Game Comm'n v. Dep't of Env't Res.*, 555 A.2d 812, 815 (Pa. 1989) (emphasis added)).

Here, Plaintiffs allege in the Complaint that, as trustees of the Commonwealth's public natural resources, the Commonwealth, DEP, and DCNR have a duty to protect and preserve the Commonwealth's public natural resources, and to prevent and abate nuisances and hazards to the public health, safety, and welfare, and to the environment. *See* Complaint ¶¶ 21-22. "Through [] DEP and [] DCNR, the Commonwealth also brings this action pursuant to its inherent *parens patriae* authority to remedy an injury to its 'quasi-sovereign interest' in the physical and economic health and well-being of a substantial segment of its population." Complaint ¶ 22. Plaintiffs further declare:

> 23. PCB contamination attributable to Defendants constitutes injury to the Commonwealth's natural resources and other property, for which the Plaintiffs seek damages and other relief, including on behalf of the

11

Commonwealth and on behalf of its residents as trustees of the Commonwealth's public natural resources, pursuant to their police powers, and, through [] DEP and [] DCNR, under *parens patriae* authority.

24. [] DEP is a department within the Executive Branch of the Commonwealth government, vested with the authority to protect the environment, prevent and remediate pollution, and protect the public health, comfort, safety, and welfare, pursuant to its police powers and its *parens patriae* authority under the [] Hazardous Sites Cleanup Act [(HSCA)], Act of October 18, 1988, P.L. 756 . . . , [*as amended*,] 35 P.S. §§ 6020.101-6020[.1305].

25. [] DCNR is a department within the Executive Branch of the Commonwealth government, vested with the authority to conserve and sustain the Commonwealth's public natural resources for the use and enjoyment of present and future generations, pursuant to its police powers and its *parens patriae* authority under the Pennsylvania Conservation and Natural Resources Act [(CNRA)], Act of June 28, 1995, P.L. 89, No. 18, [*as amended*,] 71 P. S. §§ 1340.101-1340.1103.

26. The [FBC] is an independent state agency with the mission to protect, conserve, and enhance the Commonwealth's aquatic resources and to regulate and provide fishing and boating opportunities within the Commonwealth, pursuant to the [] Fish and Boat Code of 1980 [(Fish and Boat Code)], . . . 30 Pa.C.S. §§ 101-7314.

27. The [GC] is an independent state agency with the mission to manage and protect wildlife and wildlife habitat and to inform and educate the public on wildlife and safe hunting practices within the Commonwealth, pursuant to the Pennsylvania Game and Wildlife Code [(Game and Wildlife Code)], . . . 34 Pa.C.S. §§ 101-2965.

28. [] Plaintiffs also bring this action against the Defendants pursuant to their authority within [Section 204(c) of] the Commonwealth Attorneys Act [(CAA), Act of October 15, 1980, P.L. 950, *as amended*], 71 P.S. § 732-204(c).

Complaint ¶¶ 24-28.

12

**Commonwealth Standing as *Parens Patriae***

This Court has held that "[t]he Commonwealth has *parens patriae*[11] standing whenever it asserts quasi-sovereign interests,[12] which are interests that the Commonwealth has in the well-being of its populace." *Commonwealth ex rel. Corbett v. Citizens All. for Better Neighborhoods, Inc.*, 983 A.2d 1274, 1277 (Pa. Cmwlth. 2009); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) ("[A] [s]tate has a quasi-sovereign interest in the health and well-being - both physical and economic - of its residents in general.").

> One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the [s]tate standing to sue as *parens patriae* is whether the injury is one that the [s]tate, if it could, would likely attempt to address through its sovereign lawmaking powers.

*Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607. "A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the [s]tate and the defendant[,]" which is determined based on the facts of each case. *Id.* at 602; *see*

---

[11] "*Parens patriae* powers" refer[] to the "ancient powers of guardianship over persons under disability and of protectorship of the public interest which were originally held by the Crown of England as 'father of the country,' and which as part of the common law devolved upon the states and federal government." *In re Pruner's Est*[.], . . . 136 A.2d 107, 109 ([Pa.] 1957) (citations omitted).

*In re Milton Hershey Sch. Tr.*, 807 A.2d 324, 326 n.1 (Pa. Cmwlth. 2002).

[12] "Quasi-sovereign interests stand apart from . . . proprietary [(i.e., non-sovereign, ownership)] interests[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982); *see also Commonwealth ex rel. Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127 (Pa. Cmwlth. 2005). "[T]he right of a [s]tate to sue as *parens patriae* is not limited to suits to protect only its proprietary interests; a [s]tate also may maintain an action *parens patriae* on behalf of its citizens to protect its so-called 'quasi-sovereign' interests." *Maine v. M/V Tamano*, 357 F. Supp. 1097, 1099-100 (D. Me. 1973).

*also Commonwealth ex rel. Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127 (Pa. Cmwlth. 2005) (*TAP II*).

Moreover, the U.S. Supreme Court has expressly held:

> In [its quasi-sovereign] capacity[,] the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.  It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907).  The Pennsylvania Supreme Court affirmed the Pennsylvania Superior Court's holding that "the preservation of the waters of the state from pollution, involving danger to health, is a proper subject for the exercise of the police power, [and] cannot be seriously questioned." *Commonwealth v. Emmers*, 70 A. 762 (Pa. 1908).  Certainly, that ruling applies to preservation of state sediments, soils, air, fish, and wildlife.

Defendants concede that the Commonwealth has a quasi-sovereign interest in the abatement of public nuisances to prevent injury or potential injury to its citizens' general health and well-being.  *See* Defendants' POs ¶ 16; Defendants' Supporting Br. at 7-10; *see also Alfred L. Snapp & Son, Inc*.  Moreover, Pennsylvania law does not appear to wholly restrict other types of claims that the Commonwealth may pursue as *parens patriae*, as long as the claims are brought to protect the Commonwealth's quasi-sovereign interest for its citizens' well-being. *See TAP II* (wherein this Court held that the Commonwealth had a quasi-sovereign interest in seeking damages under the Unfair Trade Practices and Consumer Protection Law,[13] and that the Commonwealth stated sufficient causes of action for unjust enrichment, fraud, and misrepresentation); *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604-05 ("Although there are numerous examples of [] *parens*

---

[13] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1-201-10.

14

*patriae* suits [to abate public nuisances], . . . *parens patriae* interests extend well beyond the prevention of such traditional public nuisances.").

Other jurisdictions have afforded states standing in *parens patriae* to bring common law actions and/or for tort damages against companies that purportedly contaminated the states' natural resources. *See State (of Maryland) v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019) (*Exxon Mobil Corp.*) (wherein the U.S. District Court in Maryland denied demurrers, thereby permitting the state to bring claims - as *parens patriae*, as trustee of the state's natural resources, and under Maryland's environmental standing act - against 65 defendants for strict liability (defective design, failure to warn, abnormally dangerous activity), public nuisance, trespass (only for properties in the state's possession), negligence, and violations of various state environmental statutes, to redress alleged contamination of the state's waters by gasoline additive methyl tertiary butyl ether (MTBE) and to seek damages and costs for testing, cleanup, monitoring, and restoration of the state's waters); *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129 (D.R.I. 2018) (wherein the U.S. District Court in Rhode Island allowed the state to proceed with common law tort claims, strict liability - failure to warn, nuisance, and trespass actions against various oil and chemical companies for the widespread MTBE contamination of the state's waters); *State (of New Hampshire) v. Exxon Mobil Corp.*, 126 A.3d 266 (N.H. 2015) (wherein the state sued Exxon for negligence, strict liability for design defect, and strict liability for failure to warn, seeking damages for groundwater contamination caused by MTBE); *Maine v. M/V Tamano*, 357 F. Supp. 1097 (D. Me. 1973) (the U.S. District Court in Maine allowed the state and its board of environmental protection to sue a vessel, her owners, captain, and various others to recover damages incurred as a result of the discharge of approximately 100,000 gallons of oil into its waters because the state had sufficient independent interest in

its coastal waters and marine life to permit it to seek damages in its *parens patriae* capacity). Although not binding on this Court,[14] those decisions are persuasive.[15]

The *Rhode Island* Court summarized:

> [The d]efendants['] only original objection is that the [s]tate lacks the possessory interest required to complain of a trespass to polluted land and water it does not own. *See* Restatement (Second) of Torts [(Second Restatement)] § 157 (Am. Law Inst. 1965) (defining "possession" for purposes of trespass liability). And indeed the [s]tate is seeking damages not only for the harm done to property it owns - which [the d]efendants admit is not vulnerable to the present criticism - but for that to private property as well. At first blush, the [s]tate's bid to base liability here on property it does not possess seems to buck black-letter trespass law. The [s]tate outmaneuvers this potential obstacle by bringing its case as *parens patriae*.

---

[14] [W]hile decisions of the [U.S.] Supreme Court interpreting federal statutes are binding on this Court, the same is not true of decisions by the lower federal courts. *See Krentz v. Consol. Rail Corp.*, . . . 910 A.2d 20, 33 n.15 ([Pa.] 2006) ("The decisions of the [U.S.] Supreme Court interpreting federal statutes are binding on this Court."); *Hall v. Pa. Bd. of Prob. & Parole*, . . . 851 A.2d 859, . . . ([Pa.] 2004). This does not mean we are compelled to ignore on-point Third Circuit decisions or, for that matter, decisions of any federal court of appeals, interpreting a federal statute. To the contrary, such decisions in factually similar cases with persuasive legal analysis may inform our disposition of the matter before us. *In re Stevenson*, . . . 40 A.3d 1212, 1221 ([Pa.] 2012) ("The Commonwealth Court was not incorrect in observing that the pronouncements of the lower federal courts have only persuasive, not binding, effect on the courts of this Commonwealth.").

*Cole v. Pa. Dep't of Env't Prot.*, 257 A.3d 805, 813 (Pa. Cmwlth. 2021). This Court relies on the federal cases cited herein accordingly.

[15] Despite their claims to the contrary, Defendants do not cite to any controlling case law prohibiting the Commonwealth from seeking redress under other common law theories or for tort damages as a function of its quasi-sovereign interest to protect the Commonwealth's citizens from harm related to PCBs.

16

A state may proceed [in] *parens patriae* to protect its "quasi-sovereign" interests, which are the "set of interests that the [s]tate has in the well-being of its populace." *Alfred L. Snapp & Son, Inc. . . .* , 458 U.S. [at] 602 . . . . These interests include one in the integrity of a state's natural resources. *See* [*id.*] at 604-05 . . . . As *parens patriae*, the [U.S.] Supreme Court has said, "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." . . . *Tenn. Copper Co.*, 206 U.S. [at] 237 . . . . "It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Id.* In *Tennessee Copper Company*, for example, the Court held that Georgia could maintain an action against copper companies whose operations polluted the state's air, despite the fact that Georgia owned "very little of the territory alleged to be affected" and "elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief [were] wanting." *Id.* at 237-39[.]

Likewise in *Missouri v. Illinois*, [180 U.S. 208 (1901),] where the Court allowed Missouri to sue Illinois for leaving sewage to flow down the Mississippi River, thereby "poison[ing] the water supply of the inhabitants of Missouri." [*Id.* at] 243, 248 . . . . "[I]f the health and comfort of the inhabitants of a state are threatened," the [*Missouri*] Court wrote, "the state is the proper party to represent and defend them." *Id.* at 241 . . . . Closer in time and place, the Rhode Island Superior Court found that the [s]tate had *parens patriae* standing to pursue the lead-pigment manufacturers in tort to avenge damage inflicted by them on the state's children. *See State* [*(of Rhode Island)*] *v. Lead Indus. Ass'n*, [*Inc.*,] No. 99-5226, 2001 WL 345830, at *3-4 (R.I. Super.[, filed] Apr. 2, 2001) (Silverstein, J.), *rev'd on other grounds*, 951 A.2d [428 (R.I. 2008)]. And even more recently, the New Hampshire Supreme Court held that its state had "*parens patriae* standing to bring contamination suits," including for trespass, "against the MTBE defendants on behalf of the residents of New Hampshire." *New Hampshire v. City of Dover*, . . . 891 A.2d 524, 527, 530 ([N.H.] 2006). And for that reason, the [New Hampshire Supreme C]ourt allowed the state to recover damages for harm done by MTBE to

17

privately owned wells. *New Hampshire v. Hess Corp.*, . . . 20 A.3d 212, 215-16 ([N.H.] 2011).

Here, [Rhode Island] - properly proceeding as *parens patriae* - may also protect its pseudo-sovereign interest in the welfare of its citizens and integrity of its natural resources. *See Lead Indus. Ass'n*, 2001 WL 345830, at *4 ("[Q]uasi-sovereign interests include a state's interests in its citizens' health, safety, and welfare as well as in a healthful environment."). One way it may do so is seeking relief for the invasion of its citizens' possessory interests by MTBE in an action for trespass. *See New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1243 n.30 (10th Cir. 2006) (noting that the *parens patriae* doctrine provides "a state with standing to sue for damages to a broader range of natural resources because it does not require state ownership of such resources"). While possessory interests are usually for individual owners themselves to protect, when the harm to such interests is as widespread as alleged in the [s]tate's complaint, it counts as injury not just to the affected individuals, but to the state as a whole. *See Missouri*, 180 U.S. at 241 . . . ("[S]ubstantial impairment of the health and prosperity of the towns and cities of the state situated on the Mississippi river, including its commercial metropolis, would injuriously affect the entire state."); *see also Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 102 (D. Mass. 1998) (allowing [Massachusetts] to bring *parens patriae* suit where it had "alleged conduct that has potentially wide-spread impacts . . . that [were] unlikely to be addressed fully if the controversy [was] cabined in the realm of private litigation").

*Rhode Island*, 357 F. Supp. 3d at 143-44 (internal citations omitted).

Moreover, in examining whether a state can bring a *parens patriae* suit for damages, the U.S. District Court in *Maine* observed: "[T]he plain implication to be drawn from [the] cases is that, absent some substantive bar, the [c]ourt was willing to allow damages to a [s]tate suing as *parens patriae*." *Maine*, 357 F. Supp. at 1101. In response to the defendants' claims that the state's interests were too

18

speculative to be reduced to money damages, the *Maine* Court held that was a matter of proof to be met at trial, rather than a motion to dismiss. *See id.*

Persuaded by the well-reasoned decisions cited above, and applying the same rationale here, this Court holds that the Commonwealth has sufficiently asserted its own quasi-sovereign interest in preserving its waters, soils, air, fish, wildlife, and the health and well-being of its citizens in the Complaint and, thus, has *parens patriae* standing to bring the instant action.

**Commonwealth Standing as Trustee**

Article I, section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment (ERA), declares:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. The ERA "establishes a common law trust, with the Commonwealth as trustee and the public natural resources managed by the Commonwealth as the corpus of the trust. The trustee is obligated to conserve, maintain and manage the corpus of the trust for the benefit of the trust's beneficiaries - the people [-, ]" *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 193 A.3d 447, 470 (Pa. Cmwlth. 2018) (citations omitted), "including future generations."[16]  *Funk v.*

---

[16] Accordingly, the Pennsylvania Supreme Court recently confirmed that "income generated from the revenue streams [from use of the trust assets] must be returned to the corpus as a matter of trust law[,]" and may not be diverted to the General Fund for non-trust purposes. *Pa. Env't Def. Found. v. Commonwealth*, 255 A.3d 289, 314 (Pa. 2021).

*Wolf*, 144 A.3d 228, 248 (Pa. Cmwlth. 2016), *aff'd*, 158 A.3d 642 (Pa. 2017) (emphasis omitted).

> As trustee, **the Commonwealth has a duty to refrain from permitting or encouraging the degradation**, diminution, or depletion **of public natural resources**, whether such degradation, diminution, or depletion would occur **through** direct state action or indirectly, *e.g.*, because of the state's **failure to restrain the actions of private parties**. In this sense, the third clause of the [ERA] is complete because it establishes broad but concrete substantive parameters within which the Commonwealth may act.

*Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901, 957 (Pa. 2013) (emphasis added). The Pennsylvania Supreme Court recognized: "Insofar as the Commonwealth always had a recognized police power to regulate the use of land, and thus could establish standards for clean air and clean water consistent with the requirements of public health, [the ERA] is merely a general reaffirmation of past law." *Shapp v. Nat'l Gettysburg Battlefield Tower, Inc.*, 311 A.2d 588, 592 (Pa. 1973).

"[T]he public trust provisions of [the ERA] are self-executing[]" and, therefore, do not require implementing legislation to be effective. *Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 937 (Pa. 2017). Further, "[t]he standing requirements of [the ERA] are normally to be broadly construed[.]" *Pa. Game Comm'n v. Dep't of Env't Res.*, 509 A.2d 877, 883-84 (Pa. Cmwlth. 1986), *aff'd*, 555 A.2d 812 (Pa. 1989).

Here, Plaintiffs assert that, "[b]y *definition, Plaintiffs must be empowered* to proceed with affirmative litigation, including prosecuting tort claims, to recover the damages to the trust's corpus so that they may be remedied." Plaintiffs' Br. at 12 (emphasis added). In the absence of Pennsylvania-specific case law, Plaintiffs rely on court decisions from *other* jurisdictions to support that

20

conclusion. In particular, *State of Maryland, Department of Natural Resources v. Amerada Hess Corp.*, 350 F. Supp. 1060 (D. Md. 1972), wherein the state, its department of natural resources, and its port administration sued to recover damages incurred as a result of an oil discharge into the Baltimore Harbor.

In response to a standing challenge, the *Amerada Hess Corp.* Court concluded that a state's ability to protect its natural resource cannot be limited to its power to legislate. The *Amerada Hess Corp.* Court relied on the concurring opinion in *Toomer v. Witsell*, 334 U.S. 385 (1948), which specified: "A [s]tate may care for its own in utilizing the bounties of nature within her borders because it has *technical ownership* of such bounties or, when ownership is in no one, because *the [s]tate may for the common good exercise all the authority that technical ownership ordinarily confers.*" *Toomer*, 334 U.S. at 408 (Frankfurter, J., concurring) (emphasis added). The *Amerada Hess Corp.* Court held that Maryland's technical ownership of its waters gave it the legal right to sue on the public's behalf, stating that "if the [s]tate is deemed to be the trustee of the waters, then, as trustee, the [s]tate must be empowered to bring suit to protect the corpus of the trust - i.e., the waters - for the beneficiaries of the trust - i.e., the public." *Id*. at 1067. Accordingly, based on the foregoing persuasive rationale, this Court concludes that the Commonwealth also has trustee standing to bring the instant action pursuant to the ERA.

**DEP and DCNR Standing as *Parens Patriae***

Pennsylvania law does not expressly preclude Commonwealth agencies from having *parens patriae* standing. Moreover, in *Pennsylvania Department of Banking v. NCAS of Delaware, LLC*, 995 A.2d 422 (Pa. Cmwlth. 2010), this Court examined whether the Department of Banking had *parens patriae* standing. Although the *NCAS of Delaware, LLC* Court ultimately determined that the Department of Banking lacked *parens patriae* standing in the circumstances

21

presented in that case, the Court's reasoning provides guidance for the appropriate analysis to be applied. The *NCAS of Delaware, LLC* Court looked at whether the agency pled an interest beyond that of an individual citizen; specifically, after setting aside individual citizens' claims, whether the agency still had a concrete, independent, and direct quasi-sovereign interest to protect, and whether the sought-after damages were distinct from those available to individual citizens. *See id.*

In the instant matter, Plaintiffs specifically assert in the Complaint that DEP is "vested with the authority to protect the environment, prevent and remediate pollution, and protect the public health, comfort, safety, and welfare, pursuant to its police powers and its *parens patriae* authority under the [HSCA]." Complaint ¶ 24. The HSCA, among the purposes of which is to "[p]rotect the public health, safety and welfare and the natural resources of this Commonwealth from the short-term and long-term effects of the release of hazardous substances and contaminants into the environment[,]" Section 102(12)(vi) of the HSCA, 35 P.S. § 6020.102(12)(vi), also affords DEP "independent authority . . . to conduct site investigations and assessments[,] . . . to require the replacement of water supplies contaminated by [hazardous substances or contaminants, and] to take other appropriate response actions and recover from responsible persons its costs for conducting the responses." 35 P.S. § 6020.102(12)(ii). Section 301(1) of the HSCA specifically authorizes DEP to "[d]evelop, administer and enforce a program to provide for the investigation, assessment and cleanup of hazardous sites in this Commonwealth[.]" 35 P.S. § 6020.301(1). Section 301(10) of the HSCA allows DEP to "[i]nstitute, in a court of competent jurisdiction, proceedings to compel compliance[.]" 35 P.S. § 6020.301(10). Section 1101 of the HSCA makes any release of a hazardous substance or a violation of any DEP provision, regulation, or order a public nuisance, and any person allowing such release or violation is subject to related response costs. *See* 35 P.S. § 6020.1101.

22

In addition, the CSL, among the purposes of which is "not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in [the Commonwealth] that is presently polluted[,]" Section 4(3) of the CSL, 35 P.S. § 691.4(3), expressly allows DEP to issue orders necessary to enforce the CSL and to impose penalties against persons who discharge or put or place substances into Commonwealth waters that cause or contribute to pollution (which is a public nuisance). *See* Section 610 of the CSL, 35 P.S. § 691.610. Section 605 of the CSL authorizes DEP to assess civil penalties for violating the CSL or DEP's Regulations. *See* 35 P.S. § 691.605.

Plaintiffs also allege in the Complaint that DCNR is "vested with the authority to conserve and sustain the Commonwealth's public natural resources for the use and enjoyment of present and future generations, pursuant to its police powers and its *parens patriae* authority under the [CNRA]." Complaint ¶ 25. Section 101(b)(1) of the CNRA reflects the General Assembly's intention that DCNR was created "to serve as a cabinet-level advocate for our [s]tate parks, forests, rivers, trails, greenways and community recreation and heritage conservation programs to provide more focused management of the Commonwealth's recreation, natural and river environments." 71 P.S. § 1340.101(b)(1).

The provision further declares that DCNR's primary mission is

> to maintain, improve and preserve [s]tate parks, to manage [s]tate forest lands to assure their long-term health, sustainability and economic use, to provide information on [the Commonwealth's] ecological and geologic resources and to administer grant and technical assistance programs that will benefit rivers['] conservation, trails and greenways, local recreation, regional heritage conservation and environmental education programs across [the Commonwealth].

*Id*.

23

The CNRA also authorizes DCNR, *inter alia*, "to assist in the conservation, enhancement and restoration of the river resources of this Commonwealth and may make grants and provide technical assistance to local governments and nonprofit organizations for river conservation projects[,]" Section 307(a) of the CNRA, 71 P.S. § 1340.307(a); acquire, dispose of, and manage state forest lands, *see* Section 302 of the CNRA, 71 P.S. § 1340.302; "[t]o hold, manage, control, protect, maintain, utilize, develop[,] and regulate the occupancy and use of all lands, heretofore or hereafter acquired, owned, leased[,] and maintained as [s]tate forests," 71 P.S. § 1340.302(a)(3); to appoint officers and wardens authorized to protect state forests and parks from trespassing, or other offenses against the laws or regulations established for the protection of state forests and timber lands, and fish or game contained therein, *see* 71 P.S. § 1340.302(c)-(g); "[t]o supervise, maintain, improve, regulate, police and preserve all parks belonging to the Commonwealth[,]" Section 303(a)(1) of the DCNR, 71 P.S. § 1340.303(a)(1); to appoint and commission persons to preserve order in the parks, who have the authority to arrest for observed violations, *see* 71 P.S. § 1340.303(7)(i); "[t]o serve subpoenas issued for any examination, investigation or trial under any law of this Commonwealth[,]" 71 P.S. § 1340.303(7)(iv); and to promote environmental education, *see* Section 311 of the DCNR, 71 P.S. § 1340.311. Although DCNR appears to be more of an *advocate* and less of an *enforcer*, it nevertheless is responsible for overseeing and managing natural resources affected by Defendants' conduct.

Applying the *NCAS of Delaware, LLC* considerations here, this Court concludes that, setting aside any individual citizens' potential claims, DEP and DCNR have concrete, independent, and direct quasi-sovereign interests under the HSCA, CNRA, and the CSL beyond that of individual Commonwealth citizens, the violations for which they may be entitled to damages. Accordingly, DEP and DCNR

24

hold legitimate quasi-sovereign governmental interests, thus establishing *parens patriae* standing in the instant action.

### DEP, DCNR, FBC, and GC as Trustees

Although the Commonwealth is the named trustee of public natural resources under the ERA, and individual agencies and departments are not referenced therein, *see Funk*, the Pennsylvania Supreme Court has described:

> The drafters and the citizens of the Commonwealth who ratified the [ERA] . . . articulated the people's rights and the government's duties to the people in broad and flexible terms that would permit not only reactive but also anticipatory protection of the environment for the benefit of current and future generations. Moreover, **public trustee duties were delegated concomitantly to all branches and levels of government** in recognition that the quality of the environment is a task with both local and statewide implications, and **to ensure that** all **government neither** infringed upon the people's rights nor **failed to act for the benefit of the people** in this area [was] crucial to the well-being of all Pennsylvanians.

*Robinson Twp.*, 83 A.3d at 963 (emphasis added).

This Court has also recognized:

> The second provision of the ERA impels executive branch agencies [(i.e., DEP and DCNR)] and departments to act in support of conserving and maintaining public natural resources, but it cannot operate on its own to "expand the powers of a statutory agency . . . ." *Cmty. Coll. of Del*[.] *Cnty.* [*v. Fox*], 342 A.2d [468,] 482 [(Pa. Cmwlth. 1975)]. Thus, courts assessing the duties imposed upon executive branch departments and agencies by the ERA must remain cognizant of the balance the General Assembly has already struck between environmental and societal concerns in an agency or department's enabling act. *Id*. at 473.

*Funk*, 144 A.3d at 235. Accordingly, DEP has trustee standing under the ERA pursuant to the HSCA and the CSL, and DCNR has trustee standing under the ERA pursuant to the CNRA to protect the Commonwealth's natural resources.

Plaintiffs also represent in the Complaint that the FBC's mission is "to protect, conserve, and enhance the Commonwealth's aquatic resources and to regulate and provide fishing and boating opportunities within the Commonwealth, pursuant to the [Fish and Boat Code]." Complaint ¶ 26. The General Assembly has expressly charged the FBC with administering and enforcing the Fish and Boat Code and other Commonwealth laws relating to, *inter alia*, protection of fish and fishery and boating interests. *See* 30 Pa.C.S. § 321. The FBC also has "[t]he entire control of all lands or waters owned, leased or otherwise controlled . . . [and] may promulgate such rules and regulations for its use and protection as it deems necessary or in the best interests of the Commonwealth." 30 Pa.C.S. § 741(a). Those who cause damage to FBC property, either intentionally or recklessly, may be criminally charged and fined, and restitution assessed. *See* 30 Pa.C.S. § 703. In addition, the FBC may appoint waterways conservation officers and deputies with law enforcement powers, *see* 30 Pa.C.S. § 901, who "are authorized to enforce all the laws of this Commonwealth, and rules and regulations promulgated thereunder, relating to game, parks and forestry, under the direction of the [GC] and of [DCNR], respectively." 30 Pa.C.S. § 902.

Regarding the GC, Plaintiffs assert in the Complaint that the GC's mission is "to manage and protect wildlife and wildlife habitat and to inform and educate the public on wildlife and safe hunting practices within the Commonwealth, pursuant to the [Game and Wildlife Code]." Complaint ¶ 27. The Game and Wildlife Code specifies:

> The proprietary ownership, jurisdiction and control of
> game or wildlife living free in nature is vested in the

26

> Commonwealth by virtue of the continued expenditure of its funds and its efforts to protect, propagate, manage and preserve the game or wildlife population as a renewable natural resource of this Commonwealth.

34 Pa.C.S. § 2161(a).

The Game and Wildlife Code also states: "The [GC is] the agency of the Commonwealth authorized to regulate, protect, propagate, manage and preserve game or wildlife[.]" 34 Pa.C.S. § 2161(b). "The ownership, jurisdiction over and control of game or wildlife is vested in the [GC] as an independent agency of the Commonwealth in its sovereign capacity to be controlled, regulated and disposed of in accordance with this title." 34 Pa.C.S. § 103(a). "It shall be the duty of the [GC] to protect, propagate, manage and preserve the game or wildlife of this Commonwealth and to enforce, by proper actions and proceedings, the laws of this Commonwealth relating thereto." 34 Pa.C.S. § 322(a). "The [GC] has the power and duty to take all actions necessary for the administration and enforcement of this title[,]" 34 Pa.C.S. § 322(b), including "[t]ak[ing] any necessary action to accomplish and assure the purposes of this title." 34 Pa.C.S. § 322(c)(12). "The administration of all lands or waters owned, leased or otherwise controlled by the [GC] shall be under" the GC director's sole control, "and the [GC] shall promulgate regulations consistent with the purpose of this title for its use and protection as necessary to properly manage these lands or waters." 34 Pa.C.S. § 721(a). "[T]he [GC] has sufficient interest in the maintenance and care of any lands, buildings, appurtenances, waters and the flora and fauna, minerals, oil or gas thereon to promulgate regulations which are necessary to preserve and protect the users, improvements, lands and buildings under its control." 34 Pa.C.S. § 741(a). The GC may promulgate regulations to protect users, improvements, lands and buildings under its control from "[d]amages of any kind" and "to properly protect and preserve these lands for their intended use." 34 Pa.C.S. § 741(b)(2)-(3). "[T]he [GC is] . . .

27

authorized to protect and preserve lands under [its] control, may bring civil actions on behalf of the Commonwealth for the value of any damage done or materials of any kind removed from [its] lands or buildings" and "is entitled to recover the costs of gathering the evidence . . . in any civil action brought under this [S]ection where the defendant is found liable for damages." 34 Pa.C.S. § 741(d). "The Commonwealth has sufficient interest in game or wildlife living in a free state to give it standing, through its authorized agents, to recover compensatory and punitive damages in a civil action against any person who kills any game or wildlife or who damages any game or wildlife habitat." 34 Pa.C.S. § 2161(a). "The [GC] . . . may, in addition to the penalties provided in this title, bring civil actions on behalf of the Commonwealth for compensatory and punitive damages for any game or wildlife killed or any game or wildlife habitat injured or destroyed[,]" and the GC "may recover the costs of gathering the evidence, including expert testimony, in any civil action brought under this [S]ection where the defendant is found liable for damages." 34 Pa.C.S. § 2161(b). Finally, the GC may appoint enforcement officers. *See* 34 Pa.C.S. §§ 901-932.

Moreover, the Pennsylvania Supreme Court has held that "the [GC] has a substantial interest in the lands and wildlife under its control. This alone would be sufficient to give it standing to legally challenge any action which allegedly would have an adverse impact on those interests." *Pa. Game Comm'n*, 555 A.2d at 816. In his concurring opinion, Justice Rolf Larsen stated:

> **As one of this Commonwealth's trustees of our natural resources and the public estate under [a]rticle I, section 27 of our Constitution, the [GC] must have standing** to take whatever legal action is necessary and appropriate to "conserve and maintain" our "clean air, pure water," and "the natural, scenic, historic and esthetic values of the environment" where threats to game or wildlife and to waterways and lands acquired and managed by the [GC] arise.

28

*Id*. at 817 (Larsen, J., concurring) (emphasis added).

Notably, in *Amerada Hess Corp.*, wherein the defendants challenged the state of Maryland's standing to sue to recover damages incurred as a result of an oil discharge into the Baltimore Harbor, the focus was on the state's authority, and no specific challenge was made to the Maryland department of natural resources' or the port administration's standing. In *State of California By & Through the Department of Fish & Game v. S.S. Bournemouth*, 307 F. Supp. 922, 923 (C.D. Cal. 1969), the state's fish and game commission filed a complaint in rem against the vessel to recover damages incurred by discharging a quantity of bunker oil into the state's and the U.S.'s navigable waters. Applying maritime law, the U.S. District Court denied the defendants' motion to dismiss. The *S.S. Bournemouth* Court stated:

> Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that such damage to property does in fact occur, **the governmental agencies charged with protecting the public interest have a right of recourse** in rem against the offending vessel for damages to compensate for the loss.

*Id*. at 929 (emphasis added).

In addition, the fact that the agencies' various enabling statutes offer enforcement options does not necessarily preclude common law actions.

> It is well established that "statutes are not presumed to make changes in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions." *Carrozza v. Greenbaum*, . . . 916 A.2d 553, 566 ([Pa.] 2007) (quoting *Commonwealth v. Miller*, . . . 364 A.2d 886, 887 ([Pa.] 1976)). Thus, the Court will not disturb established legal principles without express direction from the Legislature. *Carrozza*, 916 A.2d at 565-66.

*Everhart v. PMA Ins. Grp.*, 938 A.2d 301, 307 (Pa. 2007).

29

As legislatively created and appointed advocates for the express purpose of protecting the Commonwealth's natural resources and, broadly construing standing under the ERA, as we must, *see Pa. Game Comm'n*, this Court concludes that DEP, DCNR, FBC, and GC have trustee standing to bring the instant action.

Because the Commonwealth, DEP, and DCNR have standing as *parens patriae*, and the Commonwealth, DEP, DCNR, FBC, and GC have trustee standing, Defendants' PO 1 (Lack of Standing) is overruled.[17]

## PO 2 (Demurrer - Public Nuisance Claim)

Defendants object to Plaintiffs' First Cause of Action - Public Nuisance - on the basis that Pennsylvania does not impose nuisance liability against a manufacturer after placing a product into the stream of commerce, and Plaintiffs do not and cannot allege that Defendants controlled their PCB products after they sold them to third parties, particularly when Defendants ceased production more than 40 years ago.

Section 821B of the Second Restatement,[18] upon which Pennsylvania courts rely, provides:

---

[17] Defendants object to Plaintiffs' declaration in the Complaint that they "also bring this action . . . pursuant to their authority within the [CAA, Section 204(c) of the CAA], 71 P.S. § 732-204(c)[,]" Complaint ¶ 28, arguing that Section 204(c) of the CAA does not confer standing in Plaintiffs. *See* Defendants' Supporting Br. at 15. Section 204(c) of the CAA states, in relevant part: "The Attorney General shall represent the Commonwealth and all Commonwealth agencies . . . in any action brought by . . . the Commonwealth or its agencies[.]" 71 P.S. § 732-204(c). Therefore, Section 204(c) of the CAA authorizes the Attorney General to *prosecute* civil actions on behalf of Commonwealth parties, but does not expressly confer *standing*. However, because it appears that Plaintiffs in that paragraph were merely stating the statutory basis for the Attorney General's representation and not claiming standing by virtue of the CAA, Defendants' preliminary objection to Complaint paragraph 28 is overruled.

[18] "The Restatement (Third) of Torts [(Third Restatement)] was published in 1998." A MAZE OF UNCERTAINTY: PA PROD. LIAB. LAW REMAINS IN A CONFUSING STATE OF FLUX, 2013 WL 504247, at *2. However, Pennsylvania state courts have yet to adopt the Third Restatement. *See*

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Second Restatement § 821B.

Section 3 of the CSL provides: "The discharge of . . . any substance into the waters of this Commonwealth, which causes or contributes to pollution . . . or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be **a public nuisance**." 35 P.S. § 691.3 (emphasis added). Section 401 of the CSL declares: "It shall be unlawful for any person . . . to put or place into any of the waters of the Commonwealth . . . any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be **a nuisance**." 35 P.S. § 691.401 (emphasis added). Section 1 of the CSL defines *waters of the Commonwealth* "to include any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of

_____

*id.*; *see also Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014). Accordingly, Pennsylvania remains a Second Restatement jurisdiction. *See Tincher*.

31

conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth." 35 P.S. § 691.1.

According to Section 1 of the CSL, *pollution*

> shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. [DEP] shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

35 P.S. § 691.1. Section 601(a) of the CSL specifies that "[a]ny activity or condition declared by [the CSL] to be a nuisance or which is otherwise in violation of [the CSL], **shall be abatable in the manner provided by law or equity for the abatement of public nuisances**[] . . . in the name of the Commonwealth . . . in [this Court.]" 35 P.S. § 691.601(a) (emphasis added). Accordingly, the Pennsylvania Supreme Court has declared that "pollution of public waterways is" a nuisance *per se*. *Machipongo Land & Coal Co., Inc. v. Commonwealth*, 799 A.2d 751, 774 (Pa. 2002).

This Court has also interpreted:

> "A public nuisance is an inconvenience or troublesome offense that annoys the whole community in general, and not merely some particular person, and produces no greater injury to one person than to another - acts that are against the well-being of the particular community - and is not dependent upon covenants." *Blue Mountain Pres*[.]

32

> *Ass*[']*n v. Eldred*, 867 A.2d 692, 704 (Pa. Cmwlth. 2005)
> (quoting *Groff v. Borough of Sellersville*, . . . 314 A.2d
> 328, 330 ([Pa. Cmwlth.] 1974)). A nuisance "affects
> health, safety or morals." *Id.* at 705 (quoting *Menger v.
> Pass*, . . . 80 A.2d 702, 703 ([Pa.] 1951)).

*SPTR, Inc. v. City of Phila.*, 150 A.3d 160, 167 (Pa. Cmwlth. 2016).

Here, relying on *Diess v. Pennsylvania Department of Transportation*, 935 A.2d 895 (Pa. Cmwlth. 2007), and *City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 906 (E.D. Pa. 2000), Defendants claim that Plaintiffs failed to allege that Monsanto *itself* released, discharged, or put PCBs into the Commonwealth's waters and, thus, have failed to plead a legally sufficient public nuisance claim. *See* Defendants' Supporting Br. at 13.

Despite that neither the Second Restatement nor Pennsylvania law requires, in order to be found to have created a public nuisance, that the creator must at all times control the nuisance-creating product, we acknowledge that this Court ruled in *Diess*:

> In this case, the [l]andowners do not allege that Allegheny
> Energy owned the fly ash at the time of the landslide. Nor
> do they aver that Allegheny Energy had the power to
> control the property upon which the fly ash had been
> deposited. The Court does not agree with the
> [l]andowners that the mere generation of the fly ash is
> sufficient to support a claim of public nuisance against
> Allegheny Energy.

*Id.* at 905.

In sustaining the preliminary objection to the landowners' public nuisance claim, the *Diess* Court expounded:

> The [c]omplaint does not aver sufficient facts to
> demonstrate that Allegheny Energy engaged in any
> conduct that caused a public nuisance. Allegheny Energy,
> while admitting it [generated the fly ash and] engaged the
> services of a company to dispose of the fly ash,
> relinquished control of the fly ash, and the transporter

33

> acquiring the fly ash controlled the disposal of the materials. Although the dispersion of fly ash throughout the affected community might constitute a nuisance, [the l]andowners have failed to connect Allegheny Energy's generation and dispossession of the fly ash with the incident that has caused the alleged harm.

*Id*. at 905. However, in *Diess*, the nuisance arose from a collapsed road embankment created by a third party using an arsenic-filled byproduct of what the manufacturer sold. Clearly, that presented a much more remote circumstance than those before this Court, where Plaintiffs allege that the marketed uses of the PCB products themselves created the nuisance. Accordingly, *Diess* is inapposite.

This Court observes that, in *Beretta*, the U.S. District Court for the Eastern District of Pennsylvania, likewise, concluded that manufacturers could not be held liable for public nuisance for their product (gun) distribution practices which could harm individuals after the products had left their control. *See id*. However, *Beretta* is also distinguishable from the instant matter because, therein, when the products left the manufacturer's control, they were legal and non-defective, and any harm that resulted from their negligent or criminal use was beyond the manufacturer's instruction and control. PCBs, on the other hand, as alleged in the Complaint and which this Court must accept as true, are volatile in and of themselves and can disperse inadvertently, without intervening negligent or criminal conduct.

Interestingly, the *Beretta* Court examined *City of Bloomington, Indiana v. Westinghouse Electric Corp.*, 891 F.2d 611 (7th Cir. 1989). Therein, Bloomington filed a complaint against Monsanto after Westinghouse purchased and used Monsanto's PCB products in its Bloomington plant, and waste containing PCBs were hauled to various Bloomington area landfills, and small concentrations of PCBs also got into the sewer effluent of the Westinghouse plant.[19] The *Bloomington* Court

---

[19] According to the *Bloomington* Court, "[i]n 1970 Monsanto commenced using a warning label advising customers not to permit PCBs to enter the environment and in 1976 Monsanto

34

upheld the trial court's dismissal of the public nuisance claim against Monsanto, stating: "[T]he pleadings do not set forth facts from which it could be concluded that Monsanto retained the right to control the PCBs beyond the point of sale to Westinghouse," *id.* at 614, and did not know that Westinghouse would release harmful waste on city property.

Unlike in *Diess*, *Beretta*, and *Bloomington*, Plaintiffs in this case pled sufficient facts in the Complaint that, if proven, may establish Defendants' liability for a public nuisance. Plaintiffs specifically allege: Defendants knew or should have known that their PCB products "would inevitably volatilize and leach, leak, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events and enter[] groundwater, waterways, waterbodies, and other waters, sediment, soils, and plants, as well as fish and other wildlife throughout the Commonwealth." Complaint ¶ 6. "More than 1,300 miles of streams and more than 3,600 lake acres in the Commonwealth have been identified as 'impaired' . . . because the PCBs in those waterbodies exceed the Commonwealth's water quality standards[.]" Complaint ¶ 12. "The Commonwealth's residents and natural resources, including its water bodies and water systems, have been and continue to be impacted by PCBs manufactured, marketed, distributed, and introduced into commerce by Defendants[.]" Complaint ¶ 17. "Monsanto's PCB mixtures and PCB-containing products were used in countless applications within the Commonwealth and leached, leaked, off-gassed, and escaped their ordinary and intended applications to contaminate the Commonwealth's waters, sediments, soils, air, and fish and wildlife." Complaint ¶ 151. "None of these expenditures would have been necessary absent Monsanto's sale and dissemination of toxic PCB

---

announced that it would stop selling PCBs since substitutes were available for electrical equipment manufacturers." *Bloomington*, 891 F.2d at 613.

35

mixtures, which, when used as intended, would inevitably contaminate natural resources and endanger people, animals, and the environment." Complaint ¶ 251.

Plaintiffs further allege:

260. Defendants manufactured, distributed, marketed, and promoted commercial PCB formulations in a manner that created or contributed to the creation of a public nuisance that is harmful to health and obstructs the free use and enjoyment of the Commonwealth's natural resources.

261. Defendants manufactured, marketed, and sold their commercial PCB formulations when they knew or should have known that PCBs were toxic to human and animal life and would inevitably enter the Commonwealth's environment.

262. Defendants knew or should have known that their PCB mixtures, as ordinarily used, would end up in the Commonwealth's natural resources, waterways, water bodies, groundwater, soils, sediments, fish and animal tissues.

263. Defendants' conduct and the presence of their PCBs annoys, injures, and endangers the comfort, repose, health, and safety of others.

264. Defendants' conduct and the presence of their PCBs in the Commonwealth significantly interfere with and obstruct the public's free use and comfortable enjoyment of the Commonwealth's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

265. Defendants' conduct and the presence of [their] PCBs in the Commonwealth's natural resources is injurious to human, animal, and environmental health.

266. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and marine habitats as well as soils and sediments.

267. Defendants' conduct caused and continues to cause harm to the Commonwealth.

36

268. The Commonwealth has suffered and will continue to suffer damage from Defendants' conduct, including incurring costs to reduce PCBs through TMDLs and other remedial measures, to remove PCBs that have invaded the Commonwealth's natural resources, to prevent PCBs from injuring additional Commonwealth natural resources, and to restore those natural resources whose use or value has been lost or impaired.

269. The Commonwealth is incurring and will continue to incur costs to investigate, monitor, analyze, and remediate PCB contamination in the Commonwealth's natural resources.

270. As a result of Defendants' conduct, the Commonwealth suffers injuries to the public interest and the health and well-being of its environment.

271. Defendants knew or should have known that the manufacture, promotion, sale, distribution, and use of their commercial PCB mixtures would cause contamination of the Commonwealth's environment.

272. Defendants knew or should have known that their PCB products would contaminate water supplies, degrade fresh water and marine habitats, endanger birds and animals, and contaminate soils and sediments in the Commonwealth.

273. In addition, Defendants knew or should have known that their PCB products are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion of fish and/or dermal contact. As a result, it was foreseeable to Defendants that humans would be exposed to PCBs through, e.g., swimming in contaminated waters or eating fish and shellfish from contaminated areas.

274. Defendants knew, or should have known, that PCB contamination they introduced or caused would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of contaminated waterbodies, including the Commonwealth's waters.

275. Defendants' conduct in manufacturing, distributing, selling, and promoting PCBs, as well as misrepresenting

or omitting the dangers those compounds foreseeably posed, constitutes an unreasonable interference with a right common to the general public, i.e., the right to freely use the Commonwealth's natural resources without obstruction and health hazard.

276. As a direct and proximate result of Defendants' creation of a public nuisance, the Commonwealth has suffered, and continues to suffer, monetary damages, including loss of value and loss of use of the Commonwealth's natural resources.

Complaint ¶¶ 260-276.

Therefore, despite that Plaintiffs do not specifically allege that Defendants *themselves* "discharged" or "put or placed [PCBs] into any of the waters of the Commonwealth," 35 P.S. § 691.401, Plaintiffs clearly declare that Defendants are responsible for PCBs entering the Commonwealth's waters because Defendants knew that the uses for which they marketed, sold, and distributed PCB mixtures would result in leaching, leaking, and escaping their intended applications and contaminating (i.e., polluting) those waters. If Plaintiffs can prove their claims, Defendants should not be permitted to escape liability merely because they did not pour PCBs into the Commonwealth's environment first-hand.

Notably, as Plaintiffs point out:

[S]everal courts have already sustained nuisance claims asserted by governmental plaintiffs against Monsanto based on similar allegations. *See, e.g.*, Ex. 3, *Oregon v. Monsanto Co.*, *et al*[.], Case No. 18-[CV]-00540, Order at 14 (Or. Circuit Ct. Jan. 9, 2019) ("[The [s]tate] allege[s] that Defendants knew that the PCBs would inevitably wind up polluting Oregon's waters through the normal, ordinary use of Defendants' customers. That is, the allegations are that it was Defendants' sale of these products into Oregon that inexorably led to the pollution giving rise to the claimed public nuisance. These allegations, if proven, would be sufficient to prove [the] required elements for a public nuisance claim."); [*Mayor & City Council of*] *Baltimore* [*v. Monsanto Co.*, 2020 WL

38

1529014[,] at *10 [(D. Md. Mar. 31, 2020)] (sustaining nuisance claim on allegations "that Monsanto manufactured, distributed, marketed, and promoted PCBs, resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the [c]ity's stormwater and other water systems and waters"); *City of San Diego v. Monsanto Co.*, 2017 WL 5632052, at *7 (S.D. Cal. Nov. 22, 2017); *City of Spokane v. Monsanto Co.*, 2016 WL 6275164, at *7 (E.D. Wash. Oct. 26, 2016).

Plaintiffs' Br. at 20.

Regarding state cases, the *Baltimore* Court observed:

[S]everal state attorneys general have asserted claims for injuries to natural resources as a result of Monsanto's conduct. *See State of Washington v. Monsanto Co.*, No. 16-2-29591-6 (Wash. Super.); *State of Oregon v. Monsanto Co.*, No. 18[-]CV[-]00540 (Or. Super.); *State of Ohio v. Monsanto Co.*, No. A1801237 (Ohio Com. Pl.). Some of those actions remain pending, and Monsanto's efforts to have them be initially dismissed on motions [have] been unsuccessful.

*Baltimore*, CV RDB-19-0483, 2020 WL 1529014, at *3.

In light of Plaintiffs' nearly identical claims in the instant matter, this Court finds the *Baltimore* Court's reasoning persuasive here:

The [c]ity has sufficiently alleged that Defendants created or substantially participated in the creation of PCBs, even though Defendants may not have maintained control over the contaminants once disseminated in the [c]ity's waters. The [c]ity has alleged that Monsanto manufactured, distributed, marketed, and promoted PCBs, resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the [c]ity's stormwater and other water systems and waters. The [c]ity further alleges that Monsanto had extensive knowledge about PCB's harmful effects; intentionally withheld this information and misrepresented to the public and government officials that PCBs were safe; and manufactured and distributed PCBs in Baltimore's waters, causing harm to the [c]ity's humans, animals, and environment.

39

Just as the plaintiffs in *Exxon* [*Mobil Corp.*] plausibly alleged that [the] defendants manufactured and distributed the toxic chemicals at issue which substantially contributed to the creation of a public nuisance, so too has the [c]ity plausibly alleged that [the D]efendants manufactured and distributed PCBs which have contaminated the [c]ity's waters, creating a public nuisance. *See* [*Exxon Mobil Corp.*,] 406 F. Supp. 3d at 469.

*Baltimore*, CV RDB-19-0483, 2020 WL 1529014, at *10 (internal citations omitted).

"[A]ccept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it does not "*appear with certainty that . . .* [Plaintiffs have failed to state a legally sufficient public nuisance claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 2 (Demurrer - Public Nuisance Claim) is overruled.


## PO 3 (Demurrer - Trespass Claim)

Defendants object to Plaintiffs' Fifth Cause of Action - Trespass - on the basis that Pennsylvania law does not recognize trespass for the manufacture of a product after it has left the manufacturer's control, and Plaintiffs failed to plead that Defendants intended their PCBs to trespass on Commonwealth lands and waters.

"It is well-settled law that in order to establish a claim for trespass, a plaintiff must prove **an intentional entrance** upon land in the possession of another without a privilege to do so." *Kennedy v. Consol Energy Inc.*, 116 A.3d 626, 636 (Pa. Super. 2015)[20] (emphasis added). "[A] person is a trespasser merely by

---

[20] "While we recognize that Pennsylvania Superior Court cases are not binding on this Court, such cases 'offer persuasive precedent where they address analogous issues.' *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018)." *Stahl v. Workers'*

intending to be where he is. The intent to be on another's land is not required to prove trespass." *Liberty Place Retail Assocs., L.P. v. Israelite Sch. of Universal Practical Knowledge*, 102 A.3d 501, 507 (Pa. Super. 2014).

> [Second Restatement Section] 158 . . . governs trespass claims in Pennsylvania:
>
> . . . .
>
> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
>
> > (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
>
> > (b) remains on the land, or
>
> > (c) fails to remove from the land a thing which he is under a duty to remove.
>
> [Second Restatement] § 158 ([Am. Law Inst.] 1965); *Smith v. King's Grant Condo.*, . . . 614 A.2d 261, 267 ([Pa. Super.] 1992), *aff['']d*, . . . 640 A.2d 1276 ([Pa.] 1994). The comment to clause (a) provides that "it is not necessary that the foreign matter should be thrown directly and immediately upon the other's land," and that instead "[i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter." *Id.* at Comment.

*Gilbert v. Synagro Cent., LLC*, 90 A.3d 37, 52 (Pa. Super. 2014), *aff'd in part, rev'd in part on other grounds*, 131 A.3d 1 (Pa. 2015). "[T]he same legal standard (intent) applies to trespasses of things and third persons[.]"[21] *Liberty Place Retail Assocs.*, 102 A.3d at 508. Notwithstanding, "[i]n accordance with the [Second] Restatement

---

*Comp. Appeal Bd. (E. Hempfield Twp.)*, 242 A.3d 3, 13 n.6 (Pa. Cmwlth. 2020). The Pennsylvania Superior Court cases cited herein are relied on for their persuasive value.

[21] In fact, "it is easier to infer the necessary intent to cause trespass of things, as opposed to persons. Piles of sand, dirt, and biosolids are inanimate objects. They go where they are placed and answer only to the laws of physics and gravity." *Liberty Place Retail Assocs.*, 102 A.3d at 508.

41

principles, courts do not impose trespass liability on sellers for injuries caused by their product after it has left the ownership and possession of the sellers." *Bloomington*, 891 F.2d at 615. Moreover, where a plaintiff fails to allege the necessary trespassory intent, the claim must be dismissed. *See id.*

Here, Plaintiffs declare in the Complaint in support of their trespass action:

321. By their conduct, Defendants wrongfully caused PCBs to enter, invade, intrude upon and injure and contaminate the natural resources of the Commonwealth, trespassing upon the Commonwealth's natural resources.

322. Defendants acted intentionally while knowing, or having reason to know, that the Commonwealth did not give Defendants authorization to act in a manner that would cause injury to the Commonwealth's natural resources.

323. Due to Defendants' wrongful and intentional conduct in introducing PCBs and PCB-containing products into [the Commonwealth], which caused injury to the natural resources of the Commonwealth, the Commonwealth and its residents have suffered and will continue to suffer damages, including impairment of the public's free use and comfortable enjoyment of the Commonwealth's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

324. Defendants' wrongful and intentional conduct in introducing PCBs and PCB-containing products into the Commonwealth was and is the direct factual and legal cause of the injury to the Commonwealth.

Complaint ¶¶ 321-324. Plaintiffs do not claim that Defendants intentionally entered onto Commonwealth land, nor intentionally directed the PCB mixtures or a third

party to do so.[22] *See Bloomington.* Therefore, Plaintiffs fail to allege that Defendants had the requisite trespassory intent. Defendants' informed understanding of the functionality and potential effects of their products cannot be interpreted as an intent to trespass throughout the Commonwealth's environment.

Because it "*appear*[*s*] *with certainty that* . . . [Plaintiffs have failed to state a legally sufficient trespass claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 3 (Demurrer - Trespass Claim) is sustained.

## PO 4 (Demurrer - Design Defect Claim)

Defendants object to Plaintiffs' Second Cause of Action - Design Defect - on the basis that Defendants owed no duty to Plaintiffs or the general public to make their products safe for the environment. Defendants further contend that Plaintiffs' design defect claim fails because the consumer expectations test is inapplicable to complex products like PCBs; Plaintiffs' allegations of an alternative product do not support liability under the risk-utility test; and Plaintiffs' allegations of environmental harm due to PCB dumping, spillage, and disposal do not state a claim because they were not intended uses of the product.

> In *Webb v. Zern*, . . . 220 A.2d 853 ([Pa.] 1966), our Supreme Court formally adopted Section 402A of the [Second Restatement] as the law governing strict products liability actions. This [S]ection provides:
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby

---

[22] "Whereas the alleged injury stems from a sale, [the p]laintiff[s'] claims are more adapted to contract law or strict liability." *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.*, 617 F. Supp. 126, 133 (D.N.H. 1984).

caused to the ultimate user or consumer, or to his property, if

> (a) the seller is engaged in the business of selling such a product, and

> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

> (2) The rule stated in [s]ubsection (1) applies although

> (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

[Second Restatement] § 402A [].

*Barton v. Lowe's Home Ctrs., Inc.*, 124 A.3d 349, 354-55 (Pa. Super. 2015).

> Accordingly, in Pennsylvania,

> a person or entity engaged in the business of selling a product has a duty to make and/or market the product - which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold" - free from "a defective condition unreasonably dangerous to the consumer or [the consumer's] property." *Accord* [Second Restatement] § 402A(1).

*Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 388 (Pa. 2014). Correspondingly, "a manufacturer or supplier has a duty to cease further distribution of a product at such point as it may know, or may reasonably be charged with knowledge that the commodity is too dangerous to be used by anyone." *Lance v. Wyeth*, 85 A.3d 434, 460 (Pa. 2014).

> "[Second Restatement Section 402A] imposes liability on the seller . . . of a defective product regardless of the lack of proven negligence or the lack of contractual relation [sic] between the seller and the injured party." *Salvador*

44

> *v. Atl*[.] *Steel Boiler Co.*, . . . 319 A.2d 903, 906 ([Pa.] 1974). The social policy reflected in the imposition of the seller's liability is clear. When a product is released into the stream of commerce, it is the seller or manufacturer who is best able to shoulder the costs and to administer the risks involved. Having derived a benefit from engaging in business, they are particularly able to allocate the losses incurred through cost increases and insurance. This assignment of liability is what Professor Prosser referred to as "social adjustment[].["] W. Prosser, Law of Torts at 495 (4th ed. 1979).

*Walton v. Avco Corp.*, 610 A.2d 454, 458 (Pa. 1992); *see also Tincher*.

Regarding whether Defendants owed a duty to Plaintiffs or the general public to make their products safe for the environment, the law is not as clear as Defendants postulate. This Court acknowledges that "the [Restatement (Third) of Torts: Products Liability ([American Law Institute] 1998) (Third Restatement)] does not limit a strict liability cause of action to the 'user or consumer,' and broadly permits any person harmed by a defective product to recover in strict liability[,]" *Thomas ex rel. Thomas v. Staples, Inc.*, 2 F. Supp. 3d 647, 655 (E.D. Pa. 2014) (quoting *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 54 (3d Cir. 2009)), and federal courts have allowed Pennsylvania bystanders to recover for foreseeable injuries caused by defective products pursuant to the Third Restatement. *See Berrier*. However, Pennsylvania courts have yet to expressly adopt the Third Restatement. *See Tincher*; *see also Sullivan v. Werner Co.*, 253 A.3d 730 (Pa. Super. 2021).

Moreover, Comment o to the Second Restatement Section 402A reflects, in pertinent part:

> Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the

same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers.

Second Restatement 402A, Comment o. Notably, when the *Webb* Court adopted the Second Restatement, it simultaneously allowed a bystander injured by the explosion of a keg his father had purchased from a beer distributor to assert a products liability action against the keg manufacturer, brewer, and beer distributor under Section 402A of the Second Restatement.

Thereafter, federal and Pennsylvania state courts have issued somewhat inconsistent decisions regarding a manufacturer's liability to product users and bystanders. The Third Circuit Court of Appeals observed in *Berrier*:

> [T]he decisions of the Pennsylvania Superior Court continue to struggle with the harsh consequences that the "intended user doctrine" can sometimes have. *See, e.g.*, *Kiak v. Crown Equip*[.] *Corp.*, [989 A.2d 385 (Pa. Super. 2010)] (employee/non-user of forklift injured by coworker operating the forklift permitted to proceed against manufacturer of forklift under [Second Restatement] Section 402A); *Schmidt v. Boardman Co.*, 958 A.2d 498 (Pa. Super. 2008) (bystanders who witnessed relatives killed and/or injured by [a] defective [fire hose] allowed to recover under [Second Restatement] Section 402A for emotional distress even though they suffered no physical injuries).

*Berrier*, 563 F.3d at 57 n.27. The inconsistent application has led to what the Pennsylvania Supreme Court has "recognize[d as] the continuing state of disrepair in the arena of Pennsylvania strict-liability design defect law." *Beard v. Johnson & Johnson, Inc.*, 41 A.3d 823, 836 (Pa. 2012).

As a result, the *Tincher* Court stated:

The preferable solution may be to have the General Assembly address this arena of substantive law. But, so

long as the possibility of comprehensive legislative reform remains unlikely or uncertain, **this Court retains the authority and duty at common law to take necessary action to avoid injustice**, **uncertainty**, **delay**, **and the possibility of different standards and procedures being employed in different courtrooms throughout the Commonwealth**.

*Id.* at 381 (emphasis added). In light of the foregoing, it is not clear that Defendants did not owe a duty to Plaintiffs or the general public to make their products safe for the environment.

"To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" *Tincher*, 104 A.3d at 384. "Under [Second Restatement Section 402A], it is irrelevant if a product is designed with all possible care, including whether it has complied with all industry and governmental standards, because the manufacturer is still liable if the product is unsafe." *Sullivan*, 253 A.3d at 747.

The Pennsylvania Supreme Court has recognized that "courts across jurisdictions have struggled to articulate the legal notion of 'defect' in a way that would . . . encompass[] the myriad [of] products on the market, in a way that can effectively resonate with a jury[,]" and that "[t]he difficulty persists particularly with respect to defects in design." *Id.*

> [T]he common law principles that delineate the strict liability cause of action, and the limits upon strict liability, reflect a balance of interests respecting what is socially or economically desirable. . . .
>
> . . . .
>
> Against this background, two standards have emerged[] that purport to reflect the competing interests of consumers and sellers, upon which all American jurisdictions judge the adequacy of a product's design: one measures "consumer expectations," and articulates the

47

standard more from the perspective of the reasonable consumer; the second balances "risk" and "utility," and articulates the standard more from the perspective of the reasonable seller.

*Tincher*, 104 A.3d at 386-87.

> Under the consumer expectations standard, [which derives from Section 402A of the Second Restatement,] a plaintiff may prove "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." [*Tincher*, 104 A.3d at 387.] The consumer expectations standard is applicable in cases where the question of how safely the product should have performed can be answered by the common experience of its users. The [*Tincher*] Court went on to recognize that a consumer expectation test might not suffice to address all factual situations, requiring it to be supplemented with a risk-utility standard. [*Id.* at 389.]
>
> Under the [more negligence-derived] risk-utility standard, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." [*Id.*] The Court in *Tincher* explicitly . . . adopted [] the [approach employed by the] California Supreme Court in *Barker* [*v. Lull Engineering Co.*, 573 P.2d 413 (Cal. 1978),] which identified the following factors as relevant to the risk-benefit balancing test for determining whether there is a design defect: (1) the gravity of danger posed by the challenged design; (2) the likelihood that such danger would occur; (3) the mechanical feasibility of a safer alternative design; (4) the financial cost of an improved design; and (5) the adverse consequences to the product and to the consumer that would result from an alternative design.

*Tincher - The New Std. in Prod. Liab.*, 3 West's Pa. Prac., Torts: Law & Advocacy § 9.4.50 (footnotes omitted); *see also Tincher*.

The *Tincher* Court recognized that the consumer expectations test had the following theoretical and practical limitations:

48

First, products whose danger is obvious or within the ordinary consumer's contemplation would be exempt from strict liability; some therefore have said that related consumer safety expectations regarding the presence of the danger are too low. *See, e.g.*, *Ahrens v. Ford Motor Co.*, 340 F.3d 1142 (10th Cir. 2003) (affirming district court decision that manufacturer not liable for defective design of tractor without seatbelt or for failing to warn of danger because plaintiff failed to adduce sufficient evidence that risk of danger was beyond contemplation of ordinary consumer). Second, a product whose danger is vague or outside the ordinary consumer's contemplation runs the risk of being subjected to arbitrary application of the strict liability doctrine; jury determinations of consumer expectations regarding the presence of danger are unpredictable. This difficulty is characteristic of products of relatively complex design.

*Tincher*, 104 A.3d at 388. The risk-utility test has the following shortcoming:

The goal and strength of a pure risk-utility test is to achieve efficiency or "to maximize the common good"; yet, this is also its perceived weakness. *See* [David G. Owen, PRODUCTS LIABILITY LAW, [] § 5.6 (Hornbook Series) (2d ed. 2008)], at 316. For, while efficiency is certainly a salutary goal of the law, it is not its only purpose and, in some respects, it conflicts with bedrock moral intuitions regarding justice in determining proper compensation for injury to persons or property in individual cases. *Compare id.* at 318 ("manufacturer applying cost-benefit analysis to safety decision-making in good faith thereby necessarily respects the equality and safety rights of consumers as a group") *with*[,] William E. Nelson, THE MORAL PERVERSITY OF THE HAND CALCULUS,[23] 45 St. Louis U.L.J. 759, 761 (2001) (describing limitations of risk-utility analysis in negligence context; "[U]ltimately the Hand calculus is not about social efficiency, love, friendship or moral arrogance. It is only about compensation. The Hand calculus does not tell an entrepreneur whether or not to

---

[23] The Honorable Learned Hand's calculus specified: "[I]f the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B [is] less than PL." *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947).

engage in conduct that will hurt one person and help another. . . . The Hand calculus serves a much narrower function. It tells an entrepreneur only that, if she engages in conduct that causes others to lose more than she gains, she will have to compensate them for their losses, but that, if she gains more than they lose, no duty of compensation will arise. . . . It is this very narrowness of the Hand calculus that makes it so morally perverse. . . .”). We should be mindful that public policy adjusts expectations of efficiency and intuitions of justice considerations, informing a seller's conduct toward consumers as a group, and ensuring proper compensation in individual cases by judicial application of the strict liability cause of action.

*Tincher*, 104 A.3d at 399-00.

Therefore, the *Tincher* Court announced:

> [I]n Pennsylvania, **the cause of action in strict products liability requires proof**, **in the alternative**, **either of the ordinary consumer's expectations or of the risk-utility of a product**.[24] To maintain the integrity and fairness of the strict products liability cause of action, each part of this

---

[24] Hence, Defendants' argument that Plaintiffs' claim fails under the consumer expectations test because PCBs are a relatively complex design "far beyond the knowledge of the ordinary consumer," Defendants' Supporting Br. at 25-26, even if true, does not alone preclude Plaintiffs' design defect claim.

In addition, Defendants' assertion that, "[u]nder Pennsylvania law, the plaintiff is required to establish the existence of a safer alternative design," Defendants' Supporting Br. at 26, is incorrect. The cases Defendants cite in support of their declaration, *Duchess v. Langston Corp.*, 769 A.2d 1131 (Pa. 2001), and *Lance*, state that alternative design is merely one of the factors to be considered. The *Lance* Court clarified:

> Neither [the defendant] nor its *amicus* . . . have cited any decision of th[e Pennsylvania Supreme] Court making an alternative safer design an absolute prerequisite to any and all design-based claims (although this is the general approach of the [Third] Restatement [], outside special contexts such as those involving prescription drugs and medical devices[.] . . .).

*Lance*, 85 A.3d at 459 n.36. Moreover, although alternative design is referenced in the Third Restatement, that has yet to be adopted as Pennsylvania law. Therefore, any purported failure by Plaintiffs to propose an alternative design is not preliminarily fatal to Plaintiffs' design defect claim.

50

standard of proof remains subject to its theoretical limitations . . . . We believe that the demands of strict liability policy are met because the composite standard retains the best functioning features of each test, when applied in the appropriate factual context.

*Id*. at 401 (emphasis added).

> Modern decisional law reflects that the focus of disputes - or at least those disputes making their way into the appellate courts - has increasingly been upon the negligence-derived risk-utility alternative formulation of the standard. The prominence of the legal issue in decisional law coincides with the advent of design defect claims, in which issues of proof tend to more complexity [sic] than where a manufacturing defect is in dispute. This development reflected the complex litigation calculus implicated in a strict liability claim premised upon this type of defect resulting from either lack of proof (for example in the case of known or foreseeable risks for which an available cure may or may not have been available at the time of design) or the relative deterrent inefficacy of a theory of liability for unknowable risks, short of exiting the market.

*Id.* at 403-04.

Relying on *Tincher*, the Pennsylvania Superior Court concluded that, although strict liability remains the standard in Pennsylvania, such that "[n]egligence principles are not used in determining whether the manufacturer exercised due care in the design and manufacture of the product[,]"

> [r]easonableness or foreseeability may be taken into consideration in other aspects of liability such as 'negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine.' *Tincher*[, 104 A.3d] at 409. Generally, those concepts may be used in determining whether, in light of its inherent dangers, the product fails to satisfy either discernable consumer expectations of safety or a risk/utility analysis.

*Sullivan*, 253 A.3d at 746.

51

Finally, the *Tincher* Court held:

> Going forward, consistent with this decision, when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product. The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and **whether a party has met the burden to prove the elements of the strict liability cause of action are issues for the finder of fact**, **whether that finder of fact is judge or jury**. A question of whether the party has met its burden of proof is properly "removed" - for example, via adjudication of a dispositive motion - "from the jury's consideration only where it is clear that reasonable minds [cannot] differ on the issue." *Hamil v. Bashline*, . . . 392 A.2d 1280, 1284-85 ([Pa.] 1978).

*Tincher*, 104 A.3d at 428 (emphasis added). The U.S. District Court for the Western District of Pennsylvania recently interpreted: "The Pennsylvania Supreme Court in *Tincher* held that the issue of a product's defect is generally for the jury to resolve." *Whyte v. Stanley Black & Decker, Inc.*, 514 F. Supp. 3d 684, 698 n.7 (W.D. Pa. 2021); *see also Amig v. Cnty. of Juniata*, 432 F. Supp. 3d 481, 489 (M.D. Pa. 2020) ("Pennsylvania's new approach to design defect liability leaves open the ability to introduce negligence-based evidence . . . .").

In the instant case, Plaintiffs allege relative to design defect:

278. At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling commercial PCB formulations.

279. Defendants' PCB mixtures and PCB-containing products were not reasonably safe as designed at the time they left Defendants' control.

280. Defendants' PCB mixtures' toxicity, ability to bio-accumulate, inability to be contained, and environmental persistence rendered them unreasonably dangerous at all times.

52

281. Defendants' PCB mixtures were unsafe as designed, as demonstrated by numerous studies as well as the U.S. Congress' and [the] EPA's prohibition on the production and sale of commercial PCBs in 1979 pursuant to the TSCA.

282. Defendants knew or should have known their PCB mixtures were not safe and were likely to contaminate natural resources within the Commonwealth, and cause toxic contamination of the Commonwealth's natural resources.

283. Defendants knew or should have known their PCB mixtures were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PCB exposure with adverse human and animal health effects as well as the overwhelming seriousness of creating widespread environmental contamination.

284. These risks were not obvious to the Commonwealth or the public.

285. Defendants manufactured, distributed, marketed, promoted, and sold PCB mixtures despite such knowledge in order to maximize their profits despite the foreseeable and known harms.

286. The seriousness of the environmental and human health risk posed by Defendants' products far outweighs any social utility of Defendants' conduct in manufacturing their commercial PCB mixtures and concealing the dangers posed to human health and the environment.

287. The rights, interests, and inconvenience to the Commonwealth and general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture, sale, and distribution of its commercial PCB mixtures.

288. Practical and feasible alternative designs capable of reducing the Commonwealth's injuries were available. Such alternatives include mineral oils, silicone fluids, vegetable oils, and nonfluid insulating chemicals, as evidenced by the rapid replacement of PCBs by such alternatives upon the prohibition of PCBs, as well as

alternative chemical formulations and/or additional chemical processing measures Defendants could have taken to enhance the safety of their PCB mixtures. Alternative chemical formulations that would have reduced the Commonwealth's injuries include a reduction of chlorine content in all PCB products, which would have materially decreased the environmental persistence and toxicity of PCBs without eliminating their typical applications or utilities.

289. Defendants' conduct caused the presence of PCBs in the Commonwealth and subsequent injury to the public interest, including the physical and economic health and well-being of the Commonwealth's citizens and the public's free use and comfortable enjoyment of the Commonwealth's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

290. The Commonwealth has suffered and will continue to suffer injuries to its natural resources, and damages to its public treasury as a result of Defendants' conduct and the presence of PCBs within the Commonwealth.

. . . .

292. Defendants are strictly liable for all damages arising out of their defectively designed PCB mixtures.

Complaint ¶¶ 278-290, 292.

As required to plead a valid design defect claim, Plaintiffs allege that Defendants' PCB products were defective, the products were defective when they left Monsanto's hands, and the defects harmed the public and/or Plaintiffs' natural resources. *See Barton*. Further, it does not appear that Pennsylvania law expressly prohibits what Defendants dubbed "Plaintiffs' novel theory [that] the 'intended user' would be the general public regardless of who used the product." Defendants' Supporting Br. at 23. Because Plaintiffs are charged with and have police power to protect the Commonwealth's citizenry and natural resources, they cannot fall under the category of casual bystanders. *See Alfred L. Snapp & Son, Inc.*; *see also Tenn. Copper Co.*; *Missouri*; *Rhode Island*; *Bull HN Info. Sys., Inc.*; *Amerada Hess Corp.*

54

Finally, although this Court acknowledges "the general rule [] that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer[,]" and Pennsylvania courts have "construed the intended use criterion strictly," *Pa. Dep't of Gen. Servs. v. U.S. Min. Prods. Co.*, 898 A.2d 590, 600-01 (Pa. 2006), at this early stage, this Court cannot declare that PCB dumping, spillage, and disposal are not intended nor logical extensions of the actionable uses of Defendants' PCB products. *See Amig* (wherein the District Court determined that plaintiff's argument - that corrections officers' misuse of a manufacturer's drug test did not preclude her product liability claim because the manufacturer can still be liable for unintended uses that are highly predictable and foreseeable - was sufficient for her claim to survive a motion to dismiss).

> We thus decline to commit a judicial overreach by prematurely considering such a critical issue at this juncture, finding that such a landmark determination is most appropriately deferred for resolution until the Court has before it a fully developed factual record. Accordingly, we conclude . . . that it is improvident to reach the merits of this issue or to extend the cases cited . . . at this stage of the litigation . . . .

*Roth v. Cabot Oil & Gas Corp.*, 919 F. Supp. 2d 476, 492 (M.D. Pa. 2013).

> [Plaintiffs'] allegations are enough to survive preliminary objections. . . . A more precise identification of the design defect . . . is a matter for discovery and reports from experts . . . . But in a complaint, it is only necessary to state the material facts "in a concise and summary form." Pa.R.Civ.P. 1019(a). [The C]omplaint accomplishes this task by furnishing a concise overview of the defects that [Plaintiffs'] intend[] to prove.
>
> . . . . [Plaintiffs] need not rule out all other possible causes of harm in [the C]omplaint; [they] need only allege a cause (or causes) of harm for which [Defendants are] liable under the law. [Plaintiffs] fulfill[] this mission by alleging concisely that [Defendants] are liable under [Second Restatement S]ection 402A for various defects in [their

55

products]. The possibility that [the contamination] resulted from other causes, or that [Defendants' PCB products] had no defects at all, are issues for the parties to litigate during discovery, at summary judgment, and, if necessary, at trial.

*Barton*, 124 A.3d at 355-56; *see also Piccolini v. Simon's Wrecking*, 686 F. Supp. 1063 (M.D. Pa. 1988) (when many factors determine whether a manufacturer is strictly liable for harm caused by its product, and the District Court cannot find as a matter of law that the plaintiffs have failed to allege a claim upon which relief can be granted, because the District Court requires a more complete record, a motion to dismiss a strict liability claim will be denied); *Baltimore*.

"[A]ccept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it does not "*appear with certainty that . . .* [Plaintiffs have failed to state a legally sufficient design defect claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 4 (Demurrer - Design Defect Claim) is overruled.

**PO 5 (Demurrer - Failure to Warn and Instruct Claim)**

Defendants object to Plaintiffs' Third Cause of Action - Failure to Warn and Instruct - on the basis that Monsanto owed no duty to warn or continue to warn Plaintiffs or the general public about the alleged environmental harm. Rather, Defendants claim their duty to warn extended only to intended users and consumers of their product, and whatever duty they may have had ended when Defendants ceased production of PCBs in 1977.

"The jurisprudence of strict liability for failure to warn [] developed in parallel[]" to strict liability for design defect. *Tincher*, 104 A.3d at 367 n.13. Thus,

56

"[i]t has long been the law in Pennsylvania that a 'defective condition' includes the lack of adequate warnings or instructions required for a product's safe use." *Walton*, 610 A.2d at 458. The Pennsylvania Superior Court has explained:

> Under Pennsylvania law, it is well established that **a dangerous product can be considered defective for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product**. *Mackowick v. Westinghouse Elec*[.] *Corp.*, . . . 575 A.2d 100, 102 ([Pa.] 1990). Comment j to [Section] 402A of the [Second] Restatement . . . states that the maker of an unreasonably dangerous product may be required to warn potential users of the product's dangerous propensities. Comment i to [Section] 402A [of the Second Restatement] states the following guideline to use in determining whether a product is "unreasonably dangerous" and thus requires warnings: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Ellis v. Chicago Bridge* [&] *Iron Co.*, . . . 545 A.2d 906, 911 ([Pa. Super.] 1988) . . . .

*Jordon by Jordon v. K-Mart Corp.*, 611 A.2d 1328, 1331 (Pa. Super. 1992) (emphasis added).

Comment j to Section 402A of the Second Restatement expounds, in relevant part:

> Where . . . the **product contains an ingredient** to which a substantial number of the population are allergic, and the ingredient is one **whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product**, **the seller is required to give warning against it**, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

57

*Id.*, Comment j (emphasis added).  A failure to warn includes a continuing duty to warn of dangers of which the manufacturer becomes aware after the product is sold. *See Walton*; *Talarico v. Skyjack, Inc.*, 191 F. Supp. 3d 394 (M.D. Pa. 2016).

> To succeed on a strict-liability failure-to-warn claim, the plaintiff "must establish only two things: [(1)] that the product was sold in a defective condition [sic] 'unreasonably dangerous' to the user, and [(2)] that the defect caused plaintiff's injury." *Phillips* [*v. A-Best Prods. Co.*], 665 A.2d [1167,] 1171 [(Pa. 1995)]; *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998) (citation omitted); *see also Dorshimer v. Zonar Sys.*, 145 F. Supp. 3d 339, 353 (M.D. Pa. 2015) ("The adequacy of the warning is evaluated solely on the basis of whether the warning was inadequate and a better warning would have prevented the injury." [])

> . . . .

> The first element of a strict-liability claim is that the product be defective.  A product is defective if it has an inadequate warning that made the product "unreasonably dangerous." *Phillips*, 665 A.2d at 1171; *see also Pavlik*, 135 F.3d at 881 ("[A]n otherwise properly designed product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the product.").  Whether the product is "unreasonably dangerous" is a question for the jury.  *See Tincher*, 104 A.3d at 335 ("Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact."); *Amato v. Bell & Gossett*, 116 A.3d 607, 620 (Pa. Super. [] 2015).[FN]7  This question can be removed from the jury "only where it is clear that reasonable minds could not differ on the issue." *Tincher*, 104 A.3d at 335; *see also Goldenstein* [*v. Repossessors Inc.*], 815 F.3d [142,] 146 [(3d Cir. 2016)].

>> [FN]7 While the [*Tincher* C]ourt expressly limited its holding to cases involving a defective design, [it] also recognized that its decision "may have an impact upon other foundational issues regarding

manufacturing or ***warning claims***." *Tincher*, 104 A.3d at 390, n.21, 431-32 (emphasis added). Since then, Pennsylvania courts have held that the **question of a product's defectiveness for a failure-to-warn claim is for the jury to resolve**. *See, e.g., Amato . . .* , 116 A.3d [at] 620 . . . .

*Whyte*, 514 F. Supp. 3d at 697-98 (additional bold emphasis added).

> The second element of a strict-liability failure-to-warn claim is that the defective warning caused the plaintiff's injury. In other words, "the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips*, 665 A.2d at 1171. For the defendant-movant to prevail on summary judgment, "the record must show that a reasonable fact finder would be bound to find that [the plaintiff] was fully aware of the risk of bodily injury [before his injury]; otherwise, we are presented with a genuine issue of fact for the jury." *Pavlik*, 135 F.3d at 884. Further, the plaintiff "enjoys the benefit of a rebuttable presumption that an adequate warning would have been heeded if it had been provided." *Id*. at 881; *Davis v. Berwind Corp., . . .* 690 A.2d 186, 190 ([Pa.] 1997).

*Whyte*, 514 F. Supp. 3d at 700.

Here, Plaintiffs' failure to warn and instruct claim and its continuing duty to warn[25] consists of the following allegations:

> 291. Defendants are under a continuing duty . . . to warn the Commonwealth, their customers, and the public about the human and environmental risks posed by its PCBs, and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.
>
> . . . .
>
> 294. At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling commercial PCB formulations.

---

[25] This Court has extrapolated from Plaintiffs' Continuing Tort/Harm Claims (discussed relative to PO 8 below) their assertions that Defendants had a continuing duty to warn, and includes that analysis in this discussion of PO 5 (Demurrer - Failure to Warn and Instruct).

295. As designers, engineers, manufacture[r]s, developers, marketers, and sellers of commercial PCB formulations, Defendants had a duty to provide reasonable instructions and adequate warnings about the environmental and health hazards posed by PCBs.

296. Defendants' PCB mixtures and PCB-containing products were not reasonably safe at the time they left Defendants' control because they lacked adequate warnings.

297. At the time Defendants manufactured, distributed, marketed, promoted, and sold PCB mixtures, they knew their PCB mixtures were not safe and were likely to contaminate natural resources within the Commonwealth, and cause toxic contamination of the Commonwealth's natural resources.

298. Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PCB mixtures were toxic and would contaminate the Commonwealth's natural resources and water systems.

299. Defendants could have warned of this danger but failed to do so and intentionally concealed information in order to maximize profits.

300. Defendants continued to conceal the dangers of PCBs after they manufactured, distributed, marketed, promoted, and sold PCBs.

301. Without adequate warnings or instructions, Defendants' PCB mixtures were unsafe to an extent beyond that which would be contemplated by an ordinary person.

302. Defendants knowingly failed to issue warnings or instructions concerning the environmental and human health dangers of PCBs, and their volatilization risks, contrary to the manner in which a reasonably prudent manufacturer would act in the same or similar circumstances.

303. Defendants' conduct caused and continues to cause injury to the physical and economic health and well-being of the Commonwealth's citizens, as well as the public's

60

free use and comfortable enjoyment of the Commonwealth's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

304. The Commonwealth has suffered and will continue to suffer injuries to its natural resources, and damages to its public treasury as a result of Defendants' conduct and the presence of PCBs within the Commonwealth.

305. Defendants are under a continuing duty . . . to warn the Commonwealth and the public about the human and environmental risks posed by [Defendants'] PCBs, and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.

306. Defendants are strictly liable for all damages arising out of their failure to provide adequate warnings and instructions.

. . . .

319. Defendants are under a continuing duty . . . to warn the Commonwealth, their customers, and the public about the human and environmental risks posed by [their] PCBs, and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.

Complaint ¶¶ 291, 294-306, 319.

In *Exxon Mobil Corp.*, the U.S. District Court of Maryland, applying Maryland products liability law that is substantially similar to Pennsylvania's products liability law, expressed:

Of course, there is no duty to "warn the world." *Gourdine v. Crews*, . . . , 955 A.2d 769, 786 ([Md.] 2008). However, the duty to warn extends "'not only to those for whose use the chattel is supplied but also to third persons whom the supplier should expect to be endangered by its use.'" [*Georgia Pac., LLC v.*] *Farrar*, . . . 69 A.3d [1028,] 1033 [(Md. 2013)] (quoting [Second] Restatement, [Section] 388 [Comment] d). And, the [s]tate plausibly alleges that the harm it suffered was a foreseeable result of defendants' placement of MTBE gasoline into the Maryland market. It avers that there was a large market for MTBE gasoline in Maryland in the 1990s; that defendants were

responsible for all or substantially all of this market; and that MTBE contamination is associated with all transportation, storage, and use of MTBE gasoline. These allegations plausibly establish that defendants had a duty to warn the [s]tate of the dangers associated with MTBE because they created and controlled a market for products in the [s]tate that posed unique, substantial harms to its resources. *See In re MTBE*, 175 F. Supp. 2d 593, 625-26 (S.D.N.Y. 2001) (finding that plaintiffs plausibly alleged that defendants owed them a duty to issue warnings for MTBE gasoline where, although the plaintiffs did not allege that the contamination of their wells was the result of their own use of MTBE gasoline, the allegations showed that their injuries were a foreseeable result of defendants' placement of MTBE gasoline in the marketplace).

*Exxon Mobil Corp.*, 406 F. Supp. 3d at 463-64 (internal record citations and quotation marks omitted).

Defendants in *Baltimore* similarly challenged the complaint on the basis that they had no duty to warn the general public of PCB dangers. The *Baltimore* Court refused to sustain Defendants' preliminary objection, reasoning:

[H]ere [as in *Exxon Mobil Corp.*], the [c]ity alleges that the Defendants, as the sole manufacturer of PCBs, knew and expected that PCBs would cause widespread water contamination and failed to provide any warnings to the public. Accordingly, the [c]ity has sufficiently pled a claim for strict product liability of failure to warn based on Defendants' duty to warn the general public, whom they allegedly knew and expected would be endangered by PCBs. *See* [*Exxon Mobil Corp.*,] 406 F. Supp. 3d at 463.

*Baltimore*, CV RDB-19-0483, 2020 WL 1529014, at *11 (internal record citations omitted). The reasoning employed by the *Exxon Mobil Corp.* and *Baltimore* Courts is persuasive here.

Plaintiffs expressly allege Defendants' failure to warn and instruct.

These allegations are enough to survive preliminary objections. . . . A more precise identification of the . . .

62

failure-to-warn defect is a matter for discovery and reports from experts . . . . But in a complaint, it is only necessary to state the material facts "in a concise and summary form." [Pa.R.Civ.P. 1019(a)]. [The C]omplaint accomplishes this task by furnishing a concise overview of the defects that [Plaintiffs'] intend[] to prove.

*Barton*, 124 A.3d at 356; *see also Piccolini*.

"[A]ccept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it does not "*appear with certainty that* . . . [Plaintiffs have failed to state a legally sufficient failure to warn and instruct claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 5 (Demurrer - Failure to Warn and Instruct Claim) is overruled.

## PO 6 (Demurrer - Negligence Claim)

Defendants object to Plaintiffs' Fourth Cause of Action - Negligence - on the basis that Plaintiffs failed to plead the essential elements of a negligence theory, and seek judicial recognition of an expansive new duty in the product manufacturer to the public at large to protect the environment not only from the intended use, but also the disposal, spillage, leakage, and dumping of their PCB products, by third parties, contrary to Pennsylvania law. Specifically, Defendants claim that they do not have a duty to protect against every possible risk to every member of the public at large, so they "owed no duty to Plaintiffs (or the general public) under Pennsylvania law. Additionally, [they] owed no duty to protect Plaintiffs from alleged harm caused by the disposal, spillage, or leakage of PCBs by third parties over whom [Monsanto] had no control." Defendants' Supporting Br. at 30.

63

In their brief, Plaintiffs declare that the factors spelled out in *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000), overwhelmingly weigh in favor of finding that Defendants owed a duty to the Commonwealth and its residents. Specifically, Plaintiffs assert: (1) the symbiotic relationship between state government and the businesses that avail themselves of such states' markets weighs in favor of finding a duty here; (2) the risk posed by Defendants' conduct far outweighs the social utility of their products, particularly given the myriad unnecessary uses for which Defendants marketed them; (3) Defendants were able to and did foresee the environmental harm their PCB products were sure to cause; (4) recognizing the duty Defendants already owe to use reasonable care, in the negligence claim context it would not impose further costs, but would enable those adversely affected by Defendants' decisions to seek recourse; and (5) the public interest is served by recognizing that Defendants had a duty to act with reasonable care towards those it knew would suffer the consequences of environmental contamination with PCBs. *See* Plaintiffs' Br. at 36-37.

"In Pennsylvania, the elements of negligence are: a duty to conform to a certain standard for the protection of others against unreasonable risks; the defendant's failure to conform to that standard; a causal connection between the conduct and the resulting injury; and actual loss or damage to the plaintiff."[26] *Brewington for Brewington v. City of Phila.*, 199 A.3d 348, 355 (Pa. 2018). "Of these four elements, the primary one is whether the defendant owed a duty of care. [*See*] *Althaus*[.]" *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003) (plurality).

---

[26] "[A] plaintiff can rely on the same conditions for nuisance to state a separate negligence claim if there is an allegation of a breach of a legal duty." *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 517 F. Supp. 3d 328, 332 (E.D. Pa. 2021).

"In general, **anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act**." Second Restatement § 302, Comment a (emphasis added). This Court has clarified:

> Whether a duty exists in any given situation **depends upon the relationship existing between the parties at a particular time**. *Burman v. Golay* [&] *Co*[.], *Inc.*, . . . 616 A.2d 657 ([Pa. Super.] 1992) . . . . Where the parties are strangers to each other, however, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions. *Alumni Assoc., Delta Zeta of Lambda Chi Alpha Fraternity v. Sullivan*, . . . 535 A.2d 1095 ([Pa. Super.] 1987), *aff'd*, . . . 572 A.2d 1209 ([Pa.] 1990).
>
> However, the scope of this duty is limited; it is not the law of Pennsylvania that a party owes a duty of care to every individual with whom that party may randomly come into contact. Rather, to the extent that there is any duty at all, it is only a duty not to expose others to risks which are reasonably foreseeable. *Braxton v. Dep*[']*t of Transp*[.], . . . 634 A.2d 1150 ([Pa. Cmwlth.] 1993)[.]

*Hicks v. Metro. Edison Co.*, 665 A.2d 529, 532-33 (Pa. Cmwlth. 1995) (emphasis added).

> To determine whether the defendant owed a duty of care, we must weigh the following five factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." [*Althaus*, 756 A.2d] at 1169. No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant.

*Cricket Lighters*, 841 A.2d at 1008-09.

Here, Plaintiffs allege in the Complaint:

308. Defendants knew or should have known their PCB mixtures were not safe and were likely to contaminate natural resources within the Commonwealth, and cause toxic contamination of the Commonwealth's natural resources.

309. Defendants knew or should have known their PCB mixtures were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PCB exposure with adverse human and animal health effects as well as the overwhelming seriousness of creating widespread environmental contamination.

310. Defendants failed to exercise ordinary care because a reasonably careful company that knew or should have known of its products' toxicity, carcinogenicity, harmfulness to humans, and harmfulness to the natural environment would not manufacture or distribute those products, or would warn of their toxic and environmentally hazardous properties, or would take steps to enhance the safety and/or reduce the toxicity and environmental persistence of the products.

311. Defendants failed to exercise ordinary care because a reasonably careful company that knew or should have known that its products could not be contained during normal production and use would not continue to manufacture or distribute those products or would warn of their dangers.

312. Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture or distribute PCB mixtures in mass quantities and to the extent and in the applications that Defendants manufactured and distributed them.

313. Defendants further were grossly negligent because they failed to exercise even slight care, placing revenue and profit generation above human and environmental health and safety. Indeed, Defendants' conduct was wanton, willful, and showed a reckless disregard or

66

conscious indifference for the rights and safety of the Commonwealth and its citizens.

314. Defendants owed the Commonwealth and its citizens a duty of care in the manufacture, distribution, marketing, promotion, and sale of PCB mixtures because it was foreseeable to Defendants that their PCB mixtures would end up in the Commonwealth's natural resources, including waterways, waterbodies, aquifers, soils, lands and submerged lands, sediments, fish and animal tissue, above-ground plants and food crops, biota, and air.

315. The seriousness of the environmental and human health risk posed by Defendants' products far outweighs any social utility of Defendants' conduct in manufacturing their commercial PCB mixtures and concealing the dangers posed to human health and the environment.

316. The rights, interests, and inconvenience to the Commonwealth and general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture, sale, and distribution of [their] commercial PCB mixtures.

317. Defendants' negligent conduct caused and continues to cause injury to the physical and economic health and well-being of the Commonwealth's citizens, as well as the public's free use and comfortable enjoyment of the Commonwealth's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

318. The Commonwealth has suffered and will continue to suffer injuries to its natural resources, and damages to its public treasury as a result of Defendants' negligent conduct.

319. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the Commonwealth, their customers, and the public about the human and environmental risks posed by [their] PCBs, and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.

Complaint ¶¶ 308-319. Plaintiffs have clearly pled that Defendants owed a duty of reasonable care, they failed to exercise reasonable care, and Plaintiffs have suffered and may continue to suffer harm and sustain damages because of Defendants' purported failure to exercise reasonable care.

Regarding Defendants' claim that Plaintiffs are attempting to impose a *new* environmental tort duty on a product manufacturer to the general public, this Court acknowledges that, in light of the General Assembly's "superior tools and resources[,]" the General Assembly is better suited than the courts to determine whether a duty exists as a matter of law. *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1245 (Pa. 2012). Moreover, the Pennsylvania Supreme Court "has [] adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, [it] will not impose new affirmative duties." *Id*. However, if and when in the absence of legislative recognition that a change is warranted, "[b]efore a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society." *Cafazzo v. Cent. Med. Health Servs., Inc.*, 668 A.2d 521, 527 (Pa. 1995) (quoting *Hoven v. Kelble*, 256 N.W.2d 379, 391 (Wis. 1977)); *see also Seebold* (applying this stricture to duty in a negligence action). Accordingly, to the extent that Defendants in this case may not already have a duty, if this Court can "say with reasonable certainty that the change will serve the best interests of society[,]" *Cafazzo*, 668 A.2d at 527 (quoting *Hoven*, 256 N.W.2d at 391), it can establish a new affirmative duty.

Further, relative to Defendants' claim that the public is beyond the orbit of danger in this case, while bystanders are often determined to be beyond a foreseeable orbit of danger, *see Hicks*, it is not outside the realm of possibility that Plaintiffs could establish a sufficient relationship between Commonwealth

68

citizens/Plaintiffs' natural resources and Defendants, such that Defendants owed a duty to Plaintiffs. *See Webb*; *Kiak*; *Schmidt*.

The evidence Plaintiffs produce during discovery and/or trial could potentially affect the determination of whether Defendants owed a duty of care to the Commonwealth and/or its citizens, and whether the manufacture, distribution, marketing, promotion, sale, disposal, spillage, or leakage of PCBs breached that duty. Accordingly, whether Plaintiffs will ultimately be able to prove each of these elements is a matter for the parties to determine after discovery, not now on preliminary objections.

"[A]ccept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it does not "*appear with certainty that . . .* [Plaintiffs have failed to state a legally sufficient negligence claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 6 (Demurrer - Negligence Claim) is overruled.

## PO 7 (Demurrer - Unjust Enrichment Claim)

Defendants object to Plaintiffs' Sixth Cause of Action - Unjust Enrichment - on the basis that Plaintiffs failed to plead that the Commonwealth conferred any benefit on Monsanto, that Plaintiffs requested or expected compensation from Monsanto before undertaking any measures to investigate or remediate PCBs or that they took any steps to secure an agreement from Monsanto to compensate the Commonwealth, or that Monsanto has actually obtained, appreciated, or accepted any benefit from the Commonwealth.

This Court has explained:

Unjust [e]nrichment is an equitable doctrine. *Styer v. Hugo*, . . . 619 A.2d 347 ([Pa. Super.] 1993), *aff[']d*, . . . 637 A.2d 276 ([Pa.] 1994). Under the doctrine, the law implies that a contract exists when a party is found to have been unjustly enriched; the doctrine requires the offending party to pay the plaintiff the value of the benefit he has conferred on the defendant. *Mitchell v. Moore*, 729 A.2d 1200 (Pa. Super. 1999) . . . . A party alleging that a defendant has been unjustly enriched must establish the following: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefit[], under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *Styer*, 619 A.2d at 350. Further, a defendant need not have accepted and appreciated the benefit intentionally; instead, the focus remains on the question of whether the defendant has been unjustly enriched. *Torchia v. Torchia*, . . . 499 A.2d 581 ([Pa. Super.] 1985). Additionally, the plaintiff bears the burden of establishing either that the defendant wrongfully secured the benefit or passively received a benefit that it would be unconscionable to retain. *Id*.

*TAP II*, 885 A.2d at 1137.

Plaintiffs assert in the Complaint:

326. The Commonwealth has incurred and will continue to incur expenses in connection with PCB contamination within the Commonwealth, including costs to investigate, assess, analyze, monitor, and remediate or restore impaired natural resources.

327. Defendants are responsible for the PCB contamination that the Commonwealth has addressed and will address, and in fairness, Defendants should have paid these costs. It would be unjust for Defendants to retain the benefit of the Commonwealth's expenditures in connection with PCB contamination of natural resources within the Commonwealth.

Complaint ¶¶ 326-327.

"The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit[s] without payment of value." *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006) (internal citations and quotations omitted). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id*. In consideration of the elements necessary to establish unjust enrichment and the events that transpired in connection with the remediation efforts of the Commonwealth's affected natural resources, this Court holds that Plaintiffs failed to state a claim for unjust enrichment as a matter of law.

Accordingly, "accept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it "*appear*[*s*] *with certainty that* . . . [Plaintiffs have failed to state a viable unjust enrichment claim against Defendants]," *Torres*, 997 A.2d at 1245 (emphasis added); *see also TAP II*, Defendants' PO 7 (Demurrer - Unjust Enrichment) is sustained.

## PO 8 (Demurrer - Continuing Tort/Harm Claims)

Defendants object to Plaintiffs' continuing tort/harm claims on the basis that a continuing tort arises only if the tortfeasor engages in continuing harmful conduct that causes ongoing injury and, in this case, because Plaintiffs acknowledge

71

that Defendants ceased production of PCBs in 1977, this action arises from completed conduct, and Plaintiffs failed to state a continuing tort.[27]

This Court has ruled that "merely because . . . [a] harm is continuous in nature does not make [a] cause of action . . . a continuing tort. *See* 2 S. Feldman, *P*[*a.*] *Trial Guide*, § 22.11 (2d rev. ed[.] 1991)." *Dellape v. Murray*, 651 A.2d 638, 640 (Pa. Cmwlth. 1994). Where an "alleged tort . . . is one that arises from completed conduct that caused continuing harm[,] . . . granting of [] judgment in favor of [the defendant is] appropriate." *Id.*

Plaintiffs admit that Monsanto ceased production of PCBs in 1977. Plaintiffs aver in the Complaint:

> 291. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced . . . , and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.
>
> . . . .
>
> 305. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced . . . , and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.
>
> . . . .
>
> 319. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced . . . , and each day on which [they] fail[] to do so constitutes a new injury to the Commonwealth.

Complaint ¶¶ 291, 305, 319.[28]

---

[27] The parties did not argue this issue relative to any statute of limitations, which would call for a different analysis.

[28] Because this Court considered Plaintiffs' continuing failure to warn in its analysis of PO 5 (Demurrer - Failure to Warn and Instruct), those allegations are not included relative to this PO 8 (Demurrer - Continuing Tort/Harm Claims).

To the extent that Plaintiffs' Complaint asserts that Defendants harmful *conduct* continues, since Defendants' "alleged tort . . . ar[o]se[] from completed conduct that [purportedly] caused continuing harm, . . . [sustaining the preliminary objection as to that point] in favor of [Defendants is] appropriate." *Dellape*, 651 A.2d at 640. However, it appears that Plaintiffs assert that Defendants had a *continuing duty to warn*, which this Court addressed, *supra*, relative to PO 5 (Demurrer - Failure to Warn and Instruct), and a *continuing duty to correct and remediate the damages* Defendants have caused, which this Court addresses below relative to PO 9 (Demurrer - Damage Claims).

Accordingly, "accept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it "*appear*[*s*] *with certainty that . . .* [Plaintiffs have failed to state a viable claim that Defendants' purported harmful *conduct* has continued]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 8 (Demurrer - Continuing Tort/Harm) is sustained. However, because it does not "*appear with certainty that . . .* [Plaintiffs have failed to state viable claims against Defendants relative to Defendants' *continuing duty to warn and/or correct and remediate* damage purportedly caused by their conduct]," *Torres*, 997 A.2d at 1245 (emphasis added), Defendants' PO 8 (Demurrer - Continuing Tort/Harm) is overruled.

### PO 9 (Demurrer - Damage Claims)

Defendants argue that Plaintiffs failed to plead viable damage claims because public expenditures made in the performance of governmental functions are

73

not recoverable in tort;[29] this is not an action for response costs and natural resource damages pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 (relating to definitions),[30] or the HSCA; and economic losses may not be recovered in tort absent physical injury or damage to Commonwealth-owned property.

Plaintiffs respond that the Pennsylvania Supreme Court has not adopted what Defendants term the free *government services rule* (more commonly called the municipal cost recovery rule), nor does there appear to be any case nationwide in which that rule was applied to bar claims by a sovereign. Plaintiffs further assert they are entitled to recover damages for environmental harm and response costs under common law, and the economic loss rule has never been applied to preclude a sovereign proceeding as trustee or *parens patriae* from prosecuting common law claims.

Plaintiffs claim in the Complaint, *inter alia*, that "the Commonwealth has expended significant time and money to assess, investigate, and monitor PCB contamination of its natural resources[,]" Complaint ¶ 159, including developing TMDLs and fish and waterfowl advisories/monitoring necessitated by the PCB contamination. *See* Complaint ¶¶ 160-249. Plaintiffs assert that "[t]he Commonwealth has also invested significant sums in a variety of site-specific efforts to assess, investigate, strategize, and implement remediation plans designed to

---

[29] According to Plaintiffs, "the [government services] rule is intended to prevent municipalities from charging the beneficiaries of police, firefighting, and similar services with their costs." Plaintiffs' Br. at 40.

[30] CERCLA "creates a private cause of action against responsible parties for the recovery of necessary costs of response incurred which are part of a clean-up or response to a hazardous waste problem." *Piccolini*, 686 F. Supp. at 1067-68.

74

remove PCBs from [Commonwealth] waters, soils, and air[,] or otherwise minimize

the impact of PCBs on those media." Complaint ¶ 250. Plaintiffs also allege:

> 254. As a result, the Commonwealth has incurred and will continue to incur significant costs in connection with PCB remediation and removal projects and the restoration of damaged natural resources. Indeed, the Commonwealth has already addressed or is in the process of addressing PCB-contamination at more than 650 sites through its Environmental Cleanup Program and will continue similar remediation efforts well into the future.
>
> 255. Further still, since 1995, pursuant to its Brownfields statute, the Land Recycling and Environmental Remediation Standards Act, [Act of May 19, 1995, P.L. 4,] 35 P.S. §§ 6026.101-6026.90[8] ("Act 2"), the Commonwealth has expended considerable resources in reviewing and facilitating third-party cleanups of some 550 Commonwealth sites, at each of which PCBs have posed costly investigative and remedial challenges.
>
> 256. Further still, Commonwealth landfills have received thousands of pounds of PCB waste, including nearly 12,000 tons of PCB-containing waste from 2012 to 2018 alone, whose presence will continue to harm and threaten additional harm to the environment into the indefinite future.
>
> 257. In addition to these expenditures and losses, the Commonwealth, through [] DEP and the [] FBC, has since 1998 collected and analyzed hatchery trout samples for PCB contamination on an annual basis. Due to PCB detections, the Commonwealth has had to reduce production of fish. For instance, on at least one occasion, specimens collected from the Huntsdale trout hatchery revealed elevated PCB levels, resulting in the Commonwealth temporarily taking that hatchery out of production.
>
> 258. The Commonwealth and its residents have suffered significant loss of use of [the Commonwealth's] natural resources, loss of important ecosystem services, and loss of the value of property, among other injuries attributable to Monsanto's conduct.

. . . .

304. The Commonwealth has suffered and will continue to suffer injuries to its natural resources, and damages to its public treasury as a result of Defendants' conduct and the presence of PCBs within the Commonwealth.

Complaint ¶¶ 254-258, 304; *see also* Complaint ¶¶ 11-17.

In their Complaint prayer for relief, Plaintiffs seek:

A. Damages for injury to the Commonwealth's natural resources, including the economic impact to the Commonwealth and its residents from loss of use, value, benefits, ecological services, or other injuries resulting from the conduct alleged herein;

B. An award of past, present, and future costs to investigate, assess, analyze, monitor, remediate, restore, and/or replace natural resources injured due to Defendants' conduct;

C. Any other damages, including punitive or exemplary damages, as permitted by law;

D. A judicial determination that each Defendant is liable for future costs related to the investigation, remediation and removal of PCBs from Commonwealth natural resources;

E. An order requiring Defendants to return all monies by which Defendants were unjustly enriched as a result of the Commonwealth's expenditures in connection with PCB contamination within the Commonwealth;

F. Litigation costs and attorneys' fees as permitted by law;

G. Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

H. Such other and further relief as the Court deems just and proper.

Complaint, *ad damnum* clause, at 82-84.

Regarding Defendants' argument that, since Plaintiffs have a fiduciary duty to conserve and maintain public natural resources, they are prohibited from recovering costs incurred in the performance of those governmental functions, this Court acknowledges it has held:

> [A] municipal corporation may not recover as damages the costs of services the provision of which was an important reason for its creation and maintenance by the people. The cost of public services for protection from a safety hazard is to be borne by the public as a whole, not assessed against a tortfeasor whose negligence creates the need for the service.[31]

*City of Pittsburgh v. Equitable Gas Co.*, 512 A.2d 83, 84 (Pa. Cmwlth. 1986) (citations omitted). The municipal cost recovery rule has been applied in Pennsylvania in only a few instances. *See id.*; *see also Delaware Cnty. Pa. v. Purdue Pharma, L.P.* (C.P. Del. Cnty. CV-2017-008095, filed Mar. 13, 2020);[32] *Commonwealth v. Gen. Pub. Utils. Corp.*, 710 F.2d 117 (3d Cir. 1983);[33] *Beretta*. Importantly, those cases were primarily limited to *municipal* rather than state government costs, did not specifically address *environmental damage* and, as this

---

[31] "[C]ertain exceptions to the general rule have been created by statutory enactment to give a municipality a claim for expenditures for fire fighting and other police power services." *Koch v. Consol. Edison Co. of N.Y., Inc.*, 468 N.E.2d 1, 8 (N.Y. 1984).

[32] *See* Plaintiffs' Supporting Br. Ex. 1 at 5-6.

[33] In *In re TMI Litigation Governmental Entities Claims*, 544 F. Supp. 853 (M.D. Pa. 1982), *vacated sub nom., Commonwealth v. General Public Utilities Corp.*, 710 F.2d 117 (3d Cir. 1983), upon which Defendants rely to argue that the Commonwealth is prohibited from recovering costs of its government operations, the trial court granted summary judgment in the defendants' favor. However, in *General Public Utilities Corp.*, the Third Circuit Court of Appeals vacated and remanded *TMI Litigation* damage rulings for the plaintiffs to have the opportunity to prove their damages, including based on their theory that a nuclear incident presented a unique type of hazard for which recovery of government service costs should be permitted. The *General Public Utilities Corp.* Court concluded that the plaintiffs should have been permitted to develop facts to support their damage claims before judgment was entered against them. *General Public Utilities Corp.* was later superseded by statute on other grounds.

Court observed in *Equitable Gas*, did not prohibit the governments from seeking to recover for *other* types of losses.

In *Koch v. Consolidated Edison Co. of New York, Inc.*, 468 N.E.2d 1, 7 (N.Y.2d 1984), the New York Court of Appeals concluded that, to the extent the plaintiffs could prove them, "plaintiffs would be entitled . . . to recover damages [from the electrical utility whose negligence caused a citywide blackout] for physical injury to persons and property[,]" plus "damages resulting from looting and vandalism by rioters[.]" *Id*. at 7. The municipal recovery rule does not expressly prohibit public entities, or a state trustee of natural resources, in particular, from recovering damages for injuries to public resources.

In *Lead Industries*, the Rhode Island Superior Court refused to apply the municipal cost recovery rule to dismiss the state's action against several lead pigment manufacturers and, thus, allowed the state to proceed and prove that it incurred substantial costs to discover and abate lead, detect lead poisoning, and provide education programs and medical care for lead-poisoned state residents. The *Lead Industries* Court concluded:

> [T]he defendants' motions to dismiss must be examined in the context of the well-established powers of the Attorney General to redress public wrongs [on the state's behalf]. To adopt the free public services rule and dismiss this action [], particularly in the absence of controlling caselaw requiring such a rule, would ignore existing authority of the Attorney General, as for example, with respect to his right to bring a public nuisance action.

*Lead Indus.*, 2001 WL 345830, at \*5. This Court finds the *Koch* and *Lead Industries* Courts' reasoning persuasive here. Therefore, it does not appear with certainty that Plaintiffs' damage claims are precluded by the municipal cost recovery rule.

Defendants also challenge Plaintiffs' damage claims on the basis that, since response costs and natural resource damages are purely statutory, and Plaintiffs

78

failed to bring this action pursuant to the CERCLA and the HSCA, Plaintiffs are not entitled to such costs. Defendants cite to *Department of Environmental Protection v. Delta Chemicals, Inc.*, 721 A.2d 411 (Pa. Cmwlth. 1998), to support their conclusion that response costs and natural resource damages are limited to statutory remedies.

However, Plaintiffs specifically claimed, *inter alia*, that the Commonwealth/DEP was authorized to recover for damages to natural resources under the HSCA. *See* Complaint ¶ 24; *see also* discussion relative to PO 1 (Demurrer - Lack of Standing), *supra*. Section 103 of the HSCA defines "natural resources" as "[l]and, fish, wildlife, biota, air, water, groundwater, drinking water supplies and other resources belonging to, managed by, held in trust by, appertaining to *or* otherwise controlled by the United States, the Commonwealth or a political subdivision. The term includes resources protected by [the ERA]." 35 P.S. § 6020.103 (emphasis added). The HSCA does not expressly limit damages to only natural resources *belonging* to the Commonwealth but, rather, appears to authorize damages for natural resources that the Commonwealth and/or the federal government and/or any local governments *manage*, *hold in trust*, or otherwise *control*.

Moreover, the HSCA does not limit the Commonwealth/DEP to only the statutory damages described therein. Notably, this Court's statement in *Delta Chemicals* that "response costs and natural resource damages . . . are entirely statutory remedies[,]" *id*. at 415 (emphasis omitted), was not made relative to an analysis of whether the Commonwealth or its agencies may seek damages for environmental contaminations but, rather, in the context of whether this Court has concurrent jurisdiction with the DEP's Environmental Hearing Board in cases involving equitable versus statutory remedies. In that respect, *Delta Chemicals* is inapposite. Further, Section 1107 of the HSCA, 35 P.S. § 6020.1107, declares that

79

it does not estop the Commonwealth/DEP from seeking other existing and cumulative rights and remedies. In addition, Section 9614(a) of CERCLA, 42 U.S.C. § 9614(a), likewise allows a state to impose additional liability for release of hazardous substances within a state. Therefore, it does not appear with certainty that Plaintiffs' damage claims are limited to Commonwealth-owned natural resources or to the statutory damages set forth in the HSCA and/or the CERCLA.

Regarding Defendants' declaration that Pennsylvania law does not permit the Commonwealth to recover damages for harm to natural resources that it does not own, this Court incorporates herein its earlier analysis of Defendants' PO 1 (Demurrer - Lack of Standing). In particular, this Court concluded that a state, as *parens patriae*, has an interest in the well-being of its populace, and an interest in its natural resources that surpasses its citizens' titles. *See Alfred L. Snapp & Son, Inc.*; *see also Rhode Island; Tenn. Copper Co*. Certainly, while possessory interests are usually for individual owners themselves to protect, when the harm to such interests is as widespread as alleged in the state's complaint, it counts as injury not just to the affected individuals, but to the state as a whole. *See Missouri*; *see also Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d at 102 (allowing state to bring *parens patriae* suit where it had "alleged conduct that has potentially wide-spread impacts . . . that [were] unlikely to be addressed fully if the controversy [was] cabined in the realm of private litigation"); *Rhode Island*.

Further, the Commonwealth's technical ownership of its waters and other natural resources gave it the legal right to sue on the public's behalf, stating that

> if the [s]tate is deemed to be the trustee of the waters [and other natural resources], then, as trustee, the [Commonwealth] must be empowered to bring suit to protect the corpus of the trust - i.e., the [natural resources] - for the beneficiaries of the trust - i.e., the public.

*Amerada Hess Corp.*, 350 F. Supp. at 1067.  Accordingly, Defendants' argument that the Commonwealth may not seek to recover damages for harm to natural resources that it does not own lacks merit based on the allegations herein.

Finally, Defendants claim that Plaintiffs may not recover economic losses in tort absent physical injury or damage to Commonwealth-owned property, and Plaintiffs' claimed damages to the public treasury do not qualify as such. Defendants rely on *General Public Utilities v. Glass Kitchens of Lancaster, Inc.*, 542 A.2d 567 (Pa. Super. 1988) and *Duquesne Light Co. v. Pennsylvania American Water, Co.*, 850 A.2d 701 (Pa. Super. 2004) to support their position.

> Traditionally, Pennsylvania's economic loss doctrine [was] "developed in the product liability context to prevent tort recovery where the only injury was to the product itself." *Sarsfield v. CitiMortgage, Inc.*, 707 F. Supp. 2d 546, 556 (M.D. Pa. 2010).  Eventually, the doctrine came to stand for the proposition that, "no cause of action can be maintained in tort for negligence or strict liability where the only injury was 'economic loss' - that is, loss that is neither physical injury nor damage to tangible property." *2-J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir. 1997) (citing *Aikens v. Baltimore & Ohio R.R. Co.*, . . . 501 A.2d 277, 279 ([Pa. Super.] 1985)).

*Amig*, 432 F. Supp. 3d at 488 (footnote omitted); *see also Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) ("The economic loss doctrine provides, 'no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage.' *Adams v. Copper Beach Townhome C[mtys.], L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003).").

> **Recently**, **however**, in *Dittman v. UPMC*, . . . 196 A.3d 1036 ([Pa.] 2018), the Pennsylvania Supreme Court limited the doctrine's application and moved away from an analysis of whether plaintiff alleges solely economic harms.  Instead, the Pennsylvania Supreme Court shifted to an examination of what *kinds of remedies* are available to the plaintiff.  Under the new *Dittman* test, the economic

> loss doctrine bars a plaintiff's solely economic claim via a *tort* action if the breached duty arises under a *contract*. *Id.* at 1054. ("[I]f . . . the duty arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action."). "Thus, [**the Pennsylvania Supreme Court in**] *Dittman* **rejected the 'general pronouncement' that 'all negligence claims for economic losses are barred under Pennsylvania law** . . . ' [and] held that 'under Pennsylvania's economic loss doctrine, **recovery for purely pecuniary damages is permissible under a negligence theory provided that the plaintiff can establish the defendant's breach of a legal duty arising under common law** that is independent of any duty assumed pursuant to contract.'" *Dalgic v. Misericordia Univ.*, No. 3:16-CV-0443, 2019 WL 2867236, at *26 (M.D. Pa. July 3, 2019).

*Amig*, 432 F. Supp. 3d at 488 (emphasis added). The *Amig* Court further declared that the economic loss doctrine may allow recovery for purely pecuniary damages in both negligence and strict liability cases. *See id.*

Moreover, in *Glass Kitchens*,[34] the Pennsylvania Superior Court quoted the economic loss rule, but nevertheless upheld the trial court's denial of the defendants' summary judgment motion stating that, although physical injury or property damage is necessary to recover economic losses, viewing the case in the light most favorable to the plaintiffs, as the courts must, the *Glass Kitchens* Court could not say with certainty that the plaintiffs could not prove such damages. Further, in *Duquesne Light Co.*, the Pennsylvania Superior Court reiterated the economic loss rule and stated that intermediate appellate courts may not recognize a new cause of tort action if, to do so, would reexamine public policy questions already

---

[34] In *Glass Kitchens*, the plaintiffs were Lancaster-based parties associated with the tourist industry who sued for economic losses purportedly caused by the nuclear incident at Three Mile Island. The *Glass Kitchens* Court concluded, without expressing an opinion on the merits of those claims, that since there existed material issues of fact regarding whether Lancaster tourist businesses, approximately 25 miles from the incident, could have suffered actual physical injury or property damage, the trial court properly denied the summary judgment motion in favor of the plaintiffs, thereby allowing them to proceed to prove such damages.

82

settled by the Pennsylvania Supreme Court. By implication, where the Pennsylvania Supreme Court has not expressly settled an issue of public policy, there is no basis on which the intermediate appellate courts must foreclose the complainants' opportunity to prove their case. Neither *Glass Kitchens* nor *Duquesne Light Co.* involved state government parties, nor dictate that this Court dismiss Plaintiffs' economic damage claims for alleged injured natural resources at this stage. In fact, like Plaintiffs, this Court failed to locate any caselaw in which the economic loss rule has been applied to preclude a state, as trustee/*parent patriae*, from seeking damages for harm to its natural resources, or limited its recovery to only those natural resources the state owns. Therefore, it does not appear with certainty that Plaintiffs' damage claims are precluded by the economic loss doctrine.

In the absence of explicit prohibitions against Plaintiffs' claimed damages under the circumstances presented in this litigation, and notwithstanding Defendants' claims to the contrary, this Court is satisfied that Plaintiffs have sufficiently pled damages (including a continuing duty to correct and remediate any harm Defendants caused) to overcome Defendants' demurrer. Ultimately, "[t]he burden of proving damages is on the plaintiff[.]" *James Corp. v. N. Allegheny Sch. Dist.*, 938 A.2d 474, 495 (Pa. Cmwlth. 2007). However, whatever the proper measure of Plaintiffs' damages in this case may be, it is premature at this stage to rule upon them in the context of these POs without discovery or development of a record.

"[A]ccept[ing] as true all well-pleaded material allegations in the [Complaint and the documents attached thereto], as well as all inferences reasonably deduced therefrom[,]" and resolving any doubt in favor of overruling the preliminary objection, as we must, because it does not "*appear with certainty that . . .* [Plaintiffs have failed to state legally sufficient claims for damages from Defendants]," *Torres*,

83

997 A.2d at 1245 (emphasis added), Defendants' PO 9 (Demurrer - Damage Claims) is overruled.

## Conclusion

For all of the above reasons, Defendants' POs 3 and 7 are sustained, Defendants' POs 1, 2, 4, 5, 6, and 9 are overruled, and Defendants' PO 8 is sustained in part and overruled in part.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania, acting :
by the Commonwealth of Pennsylvania :
Department of Environmental :
Protection and the Commonwealth of :
Pennsylvania Department of :
Conservation and Natural Resources, :
and the Pennsylvania Fish and Boat :
Commission, and the Pennsylvania :
Game Commission, :
      Plaintiffs :
           :
   v. :
           :
Monsanto Co., Solutia Inc., and :
Pharmacia LLC,       :   No. 668 M.D. 2020
      Defendants :

# O R D E R

AND NOW, this 30th day of December, 2021, Monsanto Co.'s, Solutia Inc.'s and Pharmacia LLC's (collectively, Defendants) Preliminary Objections to the First Amended Complaint (Complaint) (Preliminary Objections) filed by the Commonwealth of Pennsylvania, acting by the Commonwealth's Department of Environmental Protection, Department of Conservation and Natural Resources, Fish and Boat Commission, and Game Commission (collectively, Plaintiffs), are SUSTAINED in part, and OVERRULED in part, as follows:

Preliminary Objection 1 (Standing): Overruled.

Preliminary Objection 2 (Public Nuisance Claim): Overruled.

Preliminary Objection 3 (Trespass Claim): Sustained.

Preliminary Objection 4 (Design Defect Claim): Overruled.

Preliminary Objection 5 (Failure to Warn/Instruct Claim): Overruled.

Preliminary Objection 6 (Negligence Claim): Overruled.

Preliminary Objection 7 (Unjust Enrichment Claim): Sustained.

Preliminary Objection 8 (Continuing Tort/Harm Claim): Sustained in part, overruled in part.

Preliminary Objection 9 (Damage Claims): Overruled.

Based on the Court's disposition of the Preliminary Objections, Plaintiffs' Fifth Cause of Action (Trespass) claim and Continuing Tort/Harm claims (relating to Defendants' continuing harmful *conduct*), and Sixth Cause of Action (Unjust Enrichment) are hereby DISMISSED. Defendants are directed to file an answer to Plaintiffs' First Cause of Action (Public Nuisance), Second Cause of Action (Design Defect), Third Cause of Action (Failure to Warn/Instruct, including allegations of Defendants' continuing duty to warn), Fourth Cause of Action (Negligence), and Damage Claims (including allegations of Defendants' continuing duties to correct and remediate), within 30 days of the date of this Order.

 

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania, acting :
by the Commonwealth of Pennsylvania :
Department of Environmental :
Protection and the Commonwealth of :
Pennsylvania Department of :
Conservation and Natural Resources, :
and the Pennsylvania Fish and Boat :
Commission, and the Pennsylvania :
Game Commission, :
       Plaintiffs :
           :
    v.         : No. 668 M.D. 2020
           : Argued: October 20, 2021
Monsanto Co., Solutia Inc., and :
Pharmacia LLC, :
       Defendants :

BEFORE:  HONORABLE P. KEVIN BROBSON, President Judge
      HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE ANNE E. COVEY, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE CHRISTINE FIZZANO CANNON, Judge
      HONORABLE J. ANDREW CROMPTON, Judge

CONCURRING OPINION
BY PRESIDENT JUDGE BROBSON     FILED: December 30, 2021

At this early stage of litigation, I am willing to and do join in the majority disposition of the pending preliminary objections to the First Amended Complaint (Complaint). I write separately to note that, for at least some of the reasons advanced by the proponents of the preliminary objections, I remain skeptical that the Commonwealth plaintiffs, separately or collectively, can succeed on all their claims. I am particularly dubious of the Commonwealth plaintiffs' products liability claims

(Second and Third Causes of Action), as well as the claim relating to continuing tort/harm arising from the products liability claims.

Moreover, as this novel, complex, common law tort matter develops, it would be beneficial, in my view, for the parties to better elucidate the relation, if any, of the Commonwealth plaintiffs' common law tort theories of liability to the myriad of existing environmental statutes and regulations, state and federal, that would seem to capture some, if not all, of the alleged wrongdoing in the Complaint. I am particularly concerned about whether affording the Commonwealth and its agencies broad access to common law remedies to address and remedy environmental contamination and punish polluters would make dead letters out of our environmental laws.

Notwithstanding my concerns, as indicated above, I join the majority, accepting its disposition not as a final ruling on all the issues raised in the preliminary objections, but as simply allowing the matter to mature beyond the preliminary objection phase given the applicable standard of review, which is deferential to the Commonwealth plaintiffs.

_____
P. KEVIN BROBSON, President Judge

Judge Crompton joins in this concurring opinion.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania, acting :
by the Commonwealth of Pennsylvania :
Department of Environmental :
Protection and the Commonwealth of :
Pennsylvania Department of :
Conservation and Natural Resources, :
and the Pennsylvania Fish and Boat :
Commission, and the Pennsylvania :
Game Commission, :
          Plaintiffs :
  :  No. 668 M.D. 2020
       v. :
  :  Argued: October 20, 2021
Monsanto Co., Solutia Inc., and :
Pharmacia LLC, :
         Defendants :

BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE J. ANDREW CROMPTON, Judge

CONCURRING/DISSENTING OPINION
BY JUDGE McCULLOUGH          FILED: December 30, 2021

Although I concur with the Majority in most respects, I would overrule all of the preliminary objections of Monsanto Co., Solutia Inc., and Pharmacia LLC. I am of the view that the Commonwealth parties have pleaded sufficient facts to support each of their claims, at least for purposes of surviving preliminary objections. "In order to sustain preliminary objections, it must appear

with certainty that the law will not permit recovery and any doubt should be resolved by a refusal to sustain them." *Young v. Wetzel*, 260 A.3d 281, 287 (Pa. Cmwlth. 2021). Because I believe the record lacks such certainty in the failure of any claim before us, I would resolve my doubts in favor of allowing each to proceed beyond this initial stage of litigation.

Accordingly, I respectfully dissent with regard to the Majority's disposition of the third, seventh, and eighth preliminary objections. In all other respects, I join the Majority Opinion.

_____
PATRICIA A. McCULLOUGH, Judge